IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| S. BLAKE MURCHISON, and WILLIS SHAW, | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No 1:09-cv-00020-SLR |
| vs. | ) ) ) | |
| HARRAH'S ENTERTAINMENT, INC., HARRAH'S OPERATING COMPANY, INC., CHARLES L. ATWOOD, JEFFREY BENJAMIN, DAVID BONDERMAN, ANTHONY CIVALE, JONATHAN COSLET, KELVIN  DAVIS, JEANNE P. JACKSON, GARY W. LOVEMAN, KARL PETERSON, ERIC PRESS, MARC ROWAN, LYNN C. SWANN, and CHRISTOPHER J. WILLIAMS, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES AND LIMITED DISCOVERY TO PROPERLY DETERMINE THE AMOUNT OF THE AWARD**

ROSENTHAL, MONHAIT & GODDESS, P.A.
Joseph A. Rosenthal (#234)
jrosenthal@rmgglaw.com
P. Bradford deLeeuw (#3569)
bdeleeuw@rmgglaw.com
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
(302) 656-4433

*Delaware Counsel for Plaintiffs*

July 24, 2009

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    FACTUAL BACKGROUND ................................................................................2

     A.     Overview of the Case .................................................................................2

     B.     The Bonds at Issue .....................................................................................4

     C.     Details of the First Exchange Offer ...........................................................5

     D.     Plaintiffs' Lawsuit on Behalf of the Bondholders ....................................7

     E.     The Second Exchange Offer Resulted in Substantial Tangible Benefits to the Bondholders Represented by Plaintiffs .................................................8

           1.     The Mechanics of the Second Exchange Offer.............................8

           2.     The Tangible Benefits.................................................................10

     F.     The Tangible Benefits Presumptively Entitle Plaintiffs to an Award of Attorneys' Fees and Reimbursement of Expenses..................................11

     G.     Discovery Is Necessary in Order to Properly Calculate Plaintiffs' Award ..........13

     H.     Plaintiffs' Lawsuit Had Merit ..................................................................15

           1.     This Court Has Subject Matter Jurisdiction...............................15

                     a.     Federal Question .............................................................15

                               (1)     The Exchange Offers at Issue in *Mechala* ........................17

                               (2)     The Parties' Arguments Regarding the Legality of the Exchange Offers...........................................................18

                               (3)     Judge Baer's Analysis.......................................................19

                               (4)     Application of *Mechala* Here............................................20

                     b.     Diversity Jurisdiction......................................................20

                     c.     Supplemental Jurisdiction...............................................21

2.      Plaintiffs Have Standing .......................................................22

      a.     The "Limitation on Suits" Provisions in the Indentures Did Not Bar Plaintiffs' Lawsuit ................................................23

      b.     Plaintiffs Properly Challenged the First Exchange Offer on Behalf of Holders Not Offered the Ability to Exchange Their Old Notes .....................................................................25

      c.     Plaintiffs Properly Challenged the First Exchange Offer on Behalf of Holders That Were Able to Exchange Their Old Notes Based on Coercion ..............................................26

3.      Plaintiffs' Contract Claims Were Well-Founded......................................27

      a.     Breach of the Indenture.................................................27

            (1)     Plaintiffs' Interpretation......................................27

            (2)     Defendants' Interpretation ..................................28

            (3)     *Realogy* ...................................................................30

            (4)     Application of *Realogy* ......................................31

      b.     Breach of the Implied Covenant of Good Faith and Fair Dealing............................................................................32

4.      Plaintiffs' Claim for Equitable Rescission Was Well-Founded ...............36

5.      Plaintiffs Stated a Claim Against Harrah's Board ....................................38

III.     CONCLUSION........................................................................................................40

## TABLE OF AUTHORITIES

**CASES**                                                                                            **PAGE**

*Ajettix Inc. v. Raub*,
    804 N.Y.S.2d 580 (N.Y. Sup. 2005) ...............................................................................36

*Alaska Elec. Pension Fund v. Brown*,
    941 A.2d 1011 (Del. 2007) ......................................................................................2, 12

*Allied Artists Pictures Corp. v. Baron*,
    413 A.2d 876 (Del. 1980) .......................................................................................2, 13

*AWG Leasing Trust v. United States*,
    592 F. Supp. 2d 953 (N.D. Ohio 2008).....................................................................29

*Bank of N.Y. Mellon v. Realogy Corp.*,
    C.A. No. 4200-VCL, 2008 WL 5259732 (Del. Ch. Dec. 18, 2008) ....................30, 31, 32

*Bano v. Union Carbide Corp.*,
    273 F.3d 120 (2d Cir. 2001).....................................................................................38

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980)..................................................................................................13

*Cooperstock v. Pennwalt Corp.*,
    820 F. Supp. 921 (E.D. Pa. 1993) ............................................................................12

*Creative Research Mfg. v. Advanced Bio-Delivery LLC*,
    No. Civ.A. 1211-N, 2007 WL 286735 (Del. Ch. Jan. 30, 2007) .......................................36

*Cruden v. Bank of N.Y.*,
    957 F.2d 961 (2d Cir. 1992).....................................................................................24

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
    Civil Action No. 07-178, 2008 WL 2520809 (D. Del. June 23, 2008)............................37

*Duruaku v. BB&T Bank*,
    Civil Action No. 05-5285(KSH), 2006 WL 1805887 (D.N.J. June 29, 2006) .................21

*E. River Sav. Bank v. Sec'y of Housing & Urban Dev.*,
    702 F. Supp. 448 (S.D.N.Y. 1988) ..........................................................................37

*Emerald Investors Trust v. Gaunt Parsippany Partners*,
    492 F.3d 192 (3d Cir. 2007).....................................................................................22

*Federated Strategic Income Fund v. Mechala Group Jamaica Ltd.*,
    No. 99 CIV 10517 HB, 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999)........................ *passim*

*Fourth Branch Assocs. Mechanicville v. Niagara Mohawk Power Corp.*,
    653 N.Y.S.2d 412 (N.Y. App. Div. 1997) ........................................................32

*Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B.*,
    954 F. Supp. 438 (D.P.R. 1996)....................................................................29

*Gradient OC Master, Ltd. v. NBC Universal, Inc.*,
    930 A.2d 104 (Del. Ch. 2007).......................................................................27

*Great Plains Trust Co. v. Union Pac. R.R. Co.*,
    492 F.3d 986 (8th Cir. 2007) .........................................................................25

*Hackettstown Nat'l Bank v. D.G. Yuengling Brewing Co.*,
    74 F. 110 (2d Cir. 1896).................................................................................33

*Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*,
    No. 1:08CV1560-DFH-DML, 2008 WL 5216027 (S.D. Ind. Dec. 11, 2008)..................29

*Hynson v. Drummond Coal Co.*,
    601 A.2d 570 (Del. Ch. 1991)......................................................................36

*In re AT & T Corp.*,
    455 F.3d 160 (3d Cir. 2006.).........................................................................13

*In re Bd. of Dirs. of Multicanal S.A.*,
    340 B.R. 154 (Bankr. S.D.N.Y. 2006) .............................................................33

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001)..........................................................................13

*In re First Interstate Bancorp Consol. S'holder Litig.*,
    756 A.2d 353 (Del. Ch. 1999)......................................................................13

*In re First Peoples Bank S'holder Litig.*,
    121 F.R.D. 219 (D.N.J. 1988).......................................................................15

*In re Kaiser Aluminum Corp.*,
    380 B.R. 344 (Bankr. D. Del. 2008) ..............................................................24

*In re KTMA Acquisition Corp.*,
    153 B.R. 238 (Bankr. D. Minn. 1993) ............................................................29

*In re Oakwood Homes Corp.*,
    No. 02-13396(PJW), 2004 WL 2126514 (Bankr. D. Del. Sept. 22, 2004).......................24

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998).........................................................................13

*JMF Consulting Group II, Inc. v. Beverage Mktg. USA, Inc.*,
    No. 11005/08, 2009 WL 279302 (N.Y. Sup. Feb. 04, 2009)............................................29

*Joseph v. Shell Oil Co.*,
    482 A.2d 335 (Del. Ch. 1984).............................................................................27

*Joy Mfg. Corp. v. Pullman-Peabody Co.*,
    729 F. Supp. 449 (W.D. Pa. 1989) ........................................................................12

*JPMorgan Chase Bank, N.A. v. IDW Group, LLC*,
    No. 08 Civ. 9116(PGG), 2009 WL 321222 (S.D.N.Y. Feb. 09, 2009) ...........................35

*Kahan v. Rosenstiel*,
    424 F.2d 161 (3d Cir. 1970)...........................................................................2, 12

*LaSalle Nat'l Bank v. Perelman*,
    141 F. Supp. 2d 451 (D. Del. 2001).......................................................................39

*Libby v. L. J. Corp.*,
    247 F.2d 78 (D.C. Cir. 1957) .............................................................................37

*Mann v. Oppenheimer & Co.*,
    517 A.2d 1056 (Del. 1986) .............................................................................20

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    65 F.3d 1044 (2d Cir. 1995)...........................................................................25, 27

*Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*,
    No. 03 Civ. 5539(NRB), 2004 WL 1444868 (S.D.N.Y. June 25, 2004).........................24

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970)...............................................................................2, 12, 13

*Nicholson v. Aesthetique, Ltd.*,
    No. 18042-03, 2009 WL 348293 (N.Y. Sup. Jan. 26, 2009) ....................................36

*Oaktree Capital Mgmt., LLC v. Spectrasite Holdings, Inc.*,
    No. Civ.A. 02-548 JJF, 2002 WL 32173072 (D. Del. June 25, 2002) ............................20

*Report of the Third Circuit Task Force, Court Awarded Attorney Fees*,
    108 F.R.D. 237 (Oct. 8, 1985) ...........................................................................13

*Ruckle v. Roto Am. Corp.*,
    339 F.2d 24 (2d Cir. 1964)...............................................................................39

*Schwartz v. Celestial Seasonings, Inc.*,
    178 F.R.D. 545 (D. Colo. 1998) .........................................................................25

*Semi-Tech Litig., LLC v. Bankers Trust Co.,*
    272 F. Supp. 2d 319 (S.D.N.Y. 2003)....................................................................25, 39

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,*
    88 F.R.D. 38 (S.D.N.Y. 1980) .............................................................................23

*Starks v. Perloff Bros.,*
    760 F.2d 52 (3d Cir. 1980)...................................................................................37

*T.V. Spano Bldg. Corp.* v. *Dep't of Natural Res. & Envtl. Control,*
    628 A.2d 53 (Del. 1993) ......................................................................................38

*UPIC & Co. v. Kinder-Care Learning Ctrs., Inc.,*
    793 F. Supp. 448 (S.D.N.Y. 1992) ................................................................17, 25

*Wing Ming Props., Ltd. v. Mott Operating Corp.,*
    568 N.Y.S.2d 605 (N.Y. App. 1991) ...................................................................23

*Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.,*
    341 F. Supp. 2d 258 (S.D.N.Y. 2004)..................................................................34

## STATUTES, RULES AND REGULATIONS

15 U.S.C. §§77v..................................................................................................16

15 U.S.C. §§77aaa, *et seq.* ...................................................................... *passim*

28 U.S.C. §1331..................................................................................................21

28 U.S.C. §1332..................................................................................................20

Federal Rule of Civil Procedure
    Rule 8 .................................................................................................34
    Rule 8(a)(3)........................................................................................34
    Rule 8(f) ............................................................................................37
    Rule 23 ..............................................................................................25

## SECONDARY AUTHORITIES

3A Fletcher Cyc. Corp.
    §1135..................................................................................................38

MANUAL FOR COMPLEX LITIGATION
    § 14.121.............................................................................................13

Plaintiffs S. Blake Murchison ("Murchison") and Willis Shaw ("Shaw") (collectively, "Plaintiffs"), respectfully move for an award of attorneys' fees and reimbursement of expenses against defendants Harrah's Entertainment, Inc. ("HEI") and Harrah's Operating Company, Inc. ("HOC") (collectively "Harrah's"), Charles L. Atwood ("Atwood"), Jeffrey Benjamin ("Benjamin"), David Bonderman ("Bonderman"), Anthony Civale ("Civale"), Jonathan Coslet ("Coslet"), Kelvin Davis ("Davis"), Jeanne P. Jackson ("Jackson"), Gary W. Loveman ("Loveman"), Karl Peterson ("Peterson"), Eric Press ("Press"),  Marc Rowan ("Rowan"), Lynn C. Swann ("Swann"), and Christopher J. Williams ("Williams") (collectively "Defendants").  Plaintiffs also seek limited discovery to properly determine the amount of the award.  In support thereof, Plaintiffs state:

## I.    INTRODUCTION

Plaintiffs' lawsuit has been a success.  Plaintiffs challenged Harrah's first bond exchange offer ("First Exchange Offer") on the grounds that: a) it was unfairly limited to a cherry-picked subset of its bondholders and to the detriment of those excluded, and, b) it was ultimately inequitable to those bondholders that were pressured into participating in coercive exchanges.  [D.I.s 5, ¶¶1-3; 15, ¶¶1-6].  Defendants now ***concede***[1] they have corrected the wrongs alleged in Plaintiffs' lawsuit:

> Here, Harrah's ***Second*** Exchange Offer gave plaintiffs exactly what they originally claimed they were denied—a chance to exchange their debt for new securities or cash.

[D.I. 19, at p. 25].

Because Plaintiffs have admittedly achieved a tangible benefit on behalf of the bondholders at issue in this case, Plaintiffs stipulated with Defendants that the claims asserted in the lawsuit are moot and should be dismissed.   However, for that reason, the parties also stipulated to this Court

---

[1]     Emphasis is added and citations and quotations are omitted unless otherwise noted.

retaining jurisdiction to consider the instant motion for an award of attorneys' fees and expenses — a motion which is founded upon the long-standing corporate benefit doctrine articulated in the seminal decisions of *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970), *Kahan v. Rosenstiel*, 424 F.2d 161 (3d Cir. 1970), *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876 (Del. 1980), and *Alaska Elec. Pension Fund v. Brown*, 941 A.2d 1011 (Del. 2007).

As is more fully described herein, Plaintiffs' lawsuit was meritorious when filed and is, as a matter of law, the presumptive cause for Defendants' action in remedying the First Exchange Offer with a subsequent exchange offer ("Second Exchange Offer"). The Second Exchange Offer was commenced only ***after*** Plaintiffs' lawsuit was filed and served on Defendants, and it provides tangible benefits to Plaintiffs and the class of bondholders on whose behalf Plaintiffs filed this lawsuit. Accordingly, Plaintiffs respectfully request that this Court award attorneys' fees and expenses, and order limited discovery so that the Court can more precisely determine the amount of Plaintiffs' award.[2]

## II.    FACTUAL BACKGROUND

### A.    Overview of the Case

This case is about Harrah's unfair treatment to its bondholders in the midst of a capital restructuring that ostensibly took place to avoid bankruptcy. Specifically, on December 24, 2009, Harrah's completed a cash and debt exchange offer, the ***First*** Exchange Offer, for a series of bonds that had a total value of approximately $11.12 billion. [D.I. 15, ¶59].

---

[2]    Plaintiffs contemporaneously file and incorporate the Expert Declaration of M. Travis Keath, CFA, CPA/ABV of VALUE Incorporated and the Joint Declaration of Plaintiffs' Counsel in Support of Plaintiffs' Motion for an Award of Attorneys' Fees and Expenses and Limited Discovery to Properly Determine the Amount of the Award. The declarations are referred to respectively herein as "Keath Decl., ¶__" and "Counsel Decl., ¶__."

However, the First Exchange Offer was specifically — and unfairly — limited to "qualified institutional buyers and to certain non-U.S. investors located outside the United States" ("QIBs"). [D.I. 5, at Ex. D, p. 3].  Without any legal justification, the First Exchange Offer was ***not made available*** to similarly-situated retail bond holders or accredited investors of the ***very same bonds***. [*Id.*].  The First Exchange Offer permitted QIBs to exchange their bonds (hereinafter "Old Bonds" or "Old Notes") for cash or new bonds ("New Bonds" or "New Notes"), which would take ***priority*** over the Old Bonds (*i.e.*, bonds held by retail and accredited investors) in the event of a Harrah's bankruptcy. [D.I. 15, ¶¶50-59].

In an initial response to the First Exchange Offer, on January 9, 2009, Plaintiffs filed a class action complaint on behalf of all bondholders "ineligible to participate in" the First Exchange Offer alleging that the First Exchange Offer unfairly discriminated in favor of some bond holders by only allowing those bondholders to exchange Old Bonds for cash or New Bonds and by leaving the remaining bondholders with Old Bonds that would be subordinated by the New Bonds that were issued in the First Exchange Offer in the event of Harrah's bankruptcy. [D.I. 1, ¶57].

Although the Defendants moved to dismiss the initial complaint, [D.I. 11], Plaintiffs amended the complaint on March 4, 2009 to include claims on behalf of all the bondholders, the basic premise being that the QIBs who were able to tender their Old Bonds in the First Exchange Offer were also harmed because they were stuck with the impossible choice of tendering their Old Bonds in a company that was on the verge of bankruptcy or keeping Old Bonds that would be subordinate to the New Bonds being issued in the First Exchange Offer.  [D.I. 15, ¶¶1-6].  Plaintiffs articulated these wrongs in a five count Amended Complaint, which alleged: Breach of Contract (Count I), [*Id.*, ¶¶81-86], Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II), [*Id.*, ¶¶87-93], Violation of Trust Indenture Act of 1939 - 15 U.S.C. §§77aaa, *et seq*. ("Trust

Indenture Act") (Count III), [*Id.*, ¶¶94-101], Equitable Rescission (Count IV), [*Id.*, ¶¶102-107], and Liability of Harrah's Board, [*Id.*, ¶¶108-113].

On March 5, 2009, Harrah's submitted a Form 8-K filing with the Securities and Exchange Commission ("SEC") that described a Second Exchange Offer.   *See* March 5, 2009 Form 8-K Filing, attached hereto as **Exhibit** "**A**."  On April 9, 2009, Harrah's submitted another Form 8-K filing with the SEC which announced the expiration and final results of the Second Exchange Offer. *See* April 9, 2009 Form 8-K Filing, attached hereto as **Exhibit** "**B**."

Defendants concede that the Second Exchange Offer corrected the exact wrongs alleged in Plaintiffs' lawsuit. [D.I. 19, at p. 25].  As more specifically described herein, the Second Exchange Offer corrected the discrimination to non-QIBs.  Whereas in the First Exchange Offer, retail and accredited investors were unlawfully ***excluded*** from any bond exchanges, the Second Exchange Offer — which was publicly revealed two months after plaintiffs filed their initial Complaint — permitted retail investors to exchange their bonds for cash, and permitted accredited investors to exchange their bonds for cash and/or new bonds.  Moreover, the Second Exchange Offer also allowed QIBs that were excluded from the First Exchange Offer to tender their bonds for cash and/or new notes.  Additionally, the Second Exchange Offer allowed some of the QIBs that tendered bonds in the First Exchange Offer to exchange their New Notes for cash.

### B.    The Bonds at Issue

The Old Notes involved in the First and Second Exchange Offers were ten distinct series of Harrah's bonds.  [*See* D.I. 15, ¶51]. Plaintiff Murchison owns the 5.75% Senior Notes due 2017, and Plaintiff Shaw owns 6.5% Senior Notes due 2016.  [D.I. 15, ¶¶30-31]. Because the bonds have distinct maturity dates, the First and Second Exchange Offers classified the bonds according to a "priority" status to reflect this difference in maturity.  [D.I. 15, ¶52].

The other bonds involved herein are the New Notes that Harrah's issued in accordance with the First and Second Exchange Offers.  What is collectively referred to herein as "New Notes" are the "10.00% Second-Priority Senior Secured Notes due 2015" (hereinafter "New 2015 Notes") and the "10.00% Second-Priority Senior Secured Notes due 2018" (hereinafter "New 2018 Notes").  *See* [D.I. 15, ¶50].

### C.    Details of the First Exchange Offer

Before the First Exchange Offer commenced, there was approximately $11.2 billion aggregate principle amount (hereinafter "par value") of Old Notes.  *See* December 9, 2008 Form 8-K Filing at p. 3, attached hereto as **Exhibit** "**C**".  Harrah's announced the First Exchange Offer on November 14, 2008.  [D.I. 15, ¶46].  Later, on December 1, 2008, after an oversubscription in QIBs that attempted to tender their Old Notes for participation in the First Exchange Offer, Harrah's increased the amount available in the exchange. [*Id.*, ¶56].  Finally, on December 24, 2008, the First Exchange Offer expired and was finalized. [*Id.*, ¶¶57-59].

At no point in time was the First Exchange Offer ever available to retail holders or accredited investors.  [*Id.*, ¶¶48, 60]. The First Exchange Offer was only available to QIBs. [*Id.*]

Pursuant to the First Exchange Offer, QIBs owning approximately $2.21 billion in par value of Old Notes were able to exchange Old Notes for cash and/or New Notes.  *See* December 22, 2008 Form 8-K Filing at pp. 1-2, attached hereto as **Exhibit** "**D**."  However, QIBs owning $3.78 billion in par value of Old Notes were denied the ability to participate in the First Exchange Offer.  *Id.*  In other words, QIBs owning approximately $6 billion in par value of Old Notes attempted to participate in the First Exchange Offer but only QIBs holding $2.21 billion in par value of Old Notes were able to participate.  *Id.*  The rest of the QIBs who attempted to tender their Old Notes were excluded from the First Exchange Offer, just like all accredited investors and retail holders.

QIBs owning $2.21 billion in par value of Old Notes received: a) A total of $290 million in exchange for a par value of $450 million of the Priority level 1 Old Notes due in 2010 and 2011; b) A total of $200 million in par value of New 2015 Notes in exchange for a par value of $318 million in Priority level 1 Old Notes that were not offered for cash;  and c) A total of $850 million in par value of New 2018 Notes in exchange for $1.45 billion in Priority levels 2, 3 and 4 Old Notes.

**Exhibit D**, at pp. 1-2.

To be sure, the New Notes were better securities than and subordinated the Old Notes, as Defendants disclosed in the confidential offering memorandum to the QIBs:

> ***The unsecured nature of the claims of the non-tendered Old Notes could materially and adversely affect the value of a holder's non-tendered or not accepted Old Notes and, in the event of our bankruptcy, liquidation or insolvency, the extent of such holder's recovery.***  The New Second Lien Notes will be secured by a second-priority lien on substantially all of the Issuer's assets to the extent such assets secure obligations under the senior secured credit facilities.  The obligations under the senior secured credit facilities are secured by a first-priority lien and the obligations under the New Second Lien Notes are secured by a second-priority lien on substantially the same assets.  Consequently, any Old Notes not tendered by holders or not accepted for exchange or otherwise left outstanding following the consummation of the exchange offers will be effectively subordinated to indebtedness under the senior secured credit facilities and the New Second Lien Notes to the extent of the value of the collateral securing such obligations.  ***In the event of our bankruptcy, liquidation or insolvency, the proceeds from any collateral sales will be applied first to satisfy such indebtedness, and there would be fewer assets remaining from which the claims of the Old Notes could be satisfied. The market prices for the non-tendered or not accepted Old Notes may also be negatively affected by this effective subordination to the New Second Lien Notes.***

> \*      \*      \*

> ***To the extent the exchange offers are consummated, the aggregate principal amount of outstanding Old Notes will be reduced, with the amounts of those Old Notes at a greater Acceptance Priority Level likely to be reduced by the largest amount.***  A reduction in the amount of outstanding Old Notes of any Issue would likely adversely affect the liquidity of the non-tendered or not accepted Old Notes of that Issue.  An issue of securities with a small outstanding principal amount available for trading, or float, generally commands a lower price than does a comparable issue of securities with a greater float. ***Therefore, the market price for an Issue of Old Notes that are not tendered or not accepted by us may be adversely affected.***  A

reduced float may also make the trading prices of any Issue of Old Notes that are not exchanged more volatile.

*     *     *

***We cannot assure holders of Old Notes that as a result of the exchange offers or otherwise, one or more rating agencies, including S&P or Moody's, would not take action to downgrade or negatively comment upon their respective ratings on the Old Notes.  Any downgrade or negative comment would likely adversely affect the market price of the Old Notes.***

[D.I. 20-10, at p. 31].

The following schematic describes the flow and results of the First Exchange Offer, starting from left to right:



### D.    Plaintiffs' Lawsuit on Behalf of the Bondholders

Plaintiffs' operative complaint alleges two overarching different theories.  The first theory corresponds with the unfair bondholder discrimination, in that only some QIBs were allowed to participate in the First Exchange Offer while many QIBs, ***all*** retail holders, and ***all*** accredited investors were illegally excluded.  Plaintiffs articulated this unfair discrimination theory *vis-à-vis* all five Counts previously listed above—*i.e.*, 1) Breach of the Bond Indentures; 2) Breach of the

7

Implied Covenant of Good Faith and Fair Dealing under the Bond Indentures; 3) Violations of the Trust Indenture Act; 4) Equitable Rescission of the First Exchange Offer; and 5) Liability of Harrah's Board for tortious interference with the bond indentures.  [D.I. 15, ¶¶81-113].

The second theory involves the QIBs that *were* allowed to exchange their Old Notes.  These bondholders were stuck between a proverbial rock and a hard place:  attempt to tender their bonds for new notes or cash at an unfair exchange ratio or maintain their Old Notes which would be subordinated.  Among other things, Plaintiffs alleged that Defendants "should be forced to allocate more capital to new exchanges involving QIBs."  [D.I. 15, ¶73].  This second theory is also articulated *vis-à-vis* the lawsuits' five Counts.

### E.    The Second Exchange Offer Resulted in Substantial Tangible Benefits to the Bondholders Represented by Plaintiffs

#### 1.    The Mechanics of the Second Exchange Offer

Unlike the First Exchange Offer, the Second Exchange Offer – made subsequent to the commencement of Plaintiffs' lawsuit – was open and available to all retail holders, all accredited investors, and all QIBs.  Indeed, as Defendants themselves concede, the Second Exchange Offer is the very relief Plaintiffs sought.

In terms of the retail holders, which were universally excluded from the First Exchange Offer, Harrah's offered a bond for cash exchange.  Pursuant to that exchange, retail holders representing $24 million in par value of Old Notes received $4.8 million in cash in exchange for those notes.  **Exhibit B** at pp. 5-6.

The results for accredited investors which, like the retail holders, were universally excluded from the First Exchange Offer is blended-in with the results for QIBs.  Although Harrah's segregated and separately offered retail holders the above-referenced cash exchange, Harrah's allowed

accredited investors and QIBs to tender their bonds together in one of several different exchange mechanisms.  **Exhibit B** at pp. 5-6.

The first exchange available to accredited investors and QIBs in the Second Exchange Offer was a bond for cash exchange, specifically Priority level 2 Old Notes in an "HBC cash tender." **Exhibit B** at pp. 5-6.  Pursuant to the HBC cash tender, accredited investors and QIBs representing $523 million in par value of Priority level 2 Old Notes received $97 million in cash in exchange for those notes.  *Id.*

The next exchange available to accredited investors and QIBs was a bond-for-bond exchange.  Pursuant to that bond-for-bond exchange, accredited investors and QIBs representing a total of $5 billion in par value of Priority levels 1, 2, and 3 Old Notes received a total par value of $3.4 billion in New 2018 Notes.  **Exhibit B** at pp. 5-6.

Additionally, pursuant to the Second Exchange Offer there is an outstanding offer to exchange cash for up to a total par value of $946 million in par value of the New Notes issued by Harrah's.  *See* April 29, 2009 Form 8-K, at p. 3, attached hereto as **Exhibit** "**E**."  As of the date of the instant brief, this offer has not been completed.

The following schematic describes the flow and results of the Second Exchange Offer, starting from left to right:

# Second Exchange Offer



## 2.    The Tangible Benefits

As is evidenced by the Expert Declaration of M. Travis Keath, CFA, CPA/ABV of VALUE Incorporated, the Second Exchange Offer resulted in three distinct, tangible benefits to retail and accredited investors.  The $4.8 million in cash realized in the retail cash tender was a $2.77 million benefit to retail holders since retail holders could have exchanged those same notes for only $2.021 million in cash before the Second Exchange Offer.  Keath Decl., ¶¶18-21.

For accredited investors, the $97 million HBC cash tender resulted in a $66 million dollar benefit because holders of the exchanged notes could have only received $30.734 million in cash prior to the Second Exchange Offer.  Keath Decl., ¶¶18-21.  Accredited investors comprised a portion of the holders that received the $66 million.

Likewise, for the accredited investors, the New 2018 Notes received in the Second Exchange Offer resulted in a $347 million dollar benefit because those new notes had a real value of $956.739 whereas before the Second Exchange Offer, the Old Notes for which the new notes were exchanged only had a real value of $609.613 million.   Keath Decl., ¶¶18-21.   Accredited investors also comprised a portion of the holders that received the $347 million dollar benefit.

**F.      The Tangible Benefits Presumptively Entitle Plaintiffs to an Award of Attorneys' Fees and Reimbursement of Expenses**

To summarize:   The only bondholders that were allowed to tender bonds in the First Exchange Offer were QIBs representing approximately $2.21 billion in Old Notes.   All retail holders and accredited investors which held Old Notes were denied access to the exchange offer, and QIBs representing a total of approximately $3.78 billion in par value of Old Notes tendered their notes but were rejected.   In the end, Defendants excluded from the First Exchange Offer a sum total of bondholders that represented approximately $9 billion in par value of Old Notes.

Plaintiffs then filed their lawsuit, alleging unfair discrimination on behalf of excluded bondholders.   Plaintiffs later amended their lawsuit to include all bondholders under the theory that even the QIBs that were able to tender and have their Old Notes accepted were being forced into an inadequate capital restructuring.

Defendants instituted the Second Exchange Offer which Defendants admit "gave plaintiffs exactly what they originally claimed they were denied — a chance to exchange their debt for new securities or cash." [D.I. 19, at p. 25].   Specifically, retail holders representing a total par value of $24 million in Old Notes were able to able to receive $4.8 million in cash, which was a $2.77 million benefit to retail investors.   Accredited investors and QIBs representing a total par value of $523 million in Old Notes were able to receive $97 million in cash, which was a $66 million benefit to accredited investors and QIBs.   And accredited investors and QIBs representing a total par value of

$5 billion in Old Notes were able to receive a total of $3.4 billion in New 2018 Notes, which was another $347 million benefit to accredited investors and QIBs.

It is black letter Delaware law that courts "recognize a presumption that there is a causal relationship between the benefit and a timely filed suit." *Alaska Elec. Pension Fund*, 941 A.2d at 1015; *accord Mills*, 396 U.S. at 392; *Kahan*, 424 F.2d at 165.  Indeed, the tangible benefits of allowing retail holders to exchange their unfairly subordinated Old Notes for cash, allowing accredited investors and QIBs to exchange their unfairly subordinated Old Notes for cash or New Notes, as well as allowing accredited investors and QIBs to exchange their New Notes for cash, are exactly the sorts of benefits other courts have recognized.  *See, e.g.*, *Joy Mfg. Corp. v. Pullman-Peabody Co.*, 729 F. Supp. 449, 460 (W.D. Pa. 1989) ("Here, we have a situation where all of the shareholders of the Joy Manufacturing Company opted to accept a tender offer of $35.00 a share for the Joy stock which they held on December 18-22, 1986.  That stock which had closed on December 1, 1986, at $25.50 a share appreciated $9.50 in less than three weeks, a 37 1/4% increase which was a substantial benefit to the shareholders by any standard."); *Cooperstock v. Pennwalt Corp.*, 820 F. Supp. 921, 924 (E.D. Pa. 1993) ("Class plaintiffs ultimately received the relief they sought when Pennwalt merged with Elf, thereby mooting plaintiffs' claims and enabling Pennwalt shareholders to receive the highest cash price.").

Therefore, because Plaintiffs' lawsuit presumptively caused the Second Exchange Offer, Defendants here have the "burden of demonstrating that the lawsuit did not in any way cause their action." *Alaska Elec. Pension Fund*, 941 A.2d at 1015.

The rationale for rewarding Plaintiffs for the results achieved by this lawsuit is:

> The reason for allowing an award of attorneys' fees to plaintiff's counsel where a defendant corporation takes steps to settle or moot a case and in so doing produces the same or similar benefit sought by the shareholder's litigation is to prevent frustration of the remedial policy of providing professional compensation for such

suits when meritorious.  This rule insures that, even without a favorable adjudication, counsel will be compensated for the beneficial results they produced, provided that the action was meritorious and had a causal connection to the conferred benefit.

*Allied Artists*, 413 A.2d at 878.

As demonstrated in **Section II.H** below, Plaintiffs' lawsuit was meritorious when filed.[3]

### G.  Discovery Is Necessary in Order to Properly Calculate Plaintiffs' Award

This Court has the discretion to exercise its equitable powers and grant Plaintiffs' an award of attorneys' fees because of the aforementioned benefits achieved by this lawsuit.  *Mills*, 396 U.S. at 391-92.  Otherwise, "[t]o allow [Harrah's] to obtain full benefit from [Plaintiffs'] efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense." *Id.* at 392.  Likewise, courts have long recognized that lawyers who recover a "common fund" are entitled to reasonable attorneys' fees from the fund as a whole.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  The "percentage of fund" ("POF") method for determining an award of attorney's fees is the preferred method in the Third Circuit.  *See In re AT & T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006.); *In re Cendant Corp. Litig.*, 264 F.3d 201, 220 (3d Cir. 2001); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 333 (3d Cir. 1998); *accord* Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 254 (Oct. 8, 1985). "Attorney fees awarded under the percentage method are often between 25% and 30% of the fund." MANUAL FOR COMPLEX LITIGATION §14.121.

---

[3]      The meritorious when filed requirement only requires that some claims could reasonably survive a motion to dismiss.  *See In re First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d 353, 362 (Del. Ch. 1999) ("Here, at least some of the claims asserted in plaintiffs' Third Amended Complaint survived a motion to dismiss.  This satisfies the requirement of meritoriousness."); *accord Allied Artists*, 413 A.2d at 879 ("[I]t is not necessary that factually there be absolute assurance of ultimate success, but only that there be some reasonable hope.").

Although the benefits achieved by Plaintiffs' lawsuit are quantifiable, the exact amount of the specific benefits that are attributable to Plaintiffs' lawsuit needed for calculation of an award cannot be precisely determined without limited discovery.

As stated above, retail investors and accredited investors were completely shut out of the First Exchange, and some QIBs were unable to exchange Old Notes in the First Exchange.  As Defendants admit, that wrong alleged in this lawsuit was corrected by the Second Exchange Offer.  The three salient numbers on which to calculate an award are the $2.77 million benefit received by retail investors, the $66 million benefit received by accredited investors and QIBs as a result of the HBC cash tender, and the $347 million benefit to accredited investors and QIBs realized in the note exchange.  However, while the entire $2.77 million benefit received by the retail holders in the Second Exchange can properly and undeniably be added to the award calculation, the portion of the $66 million benefit received *vis-à-vis* the HBC cash tender and the $347 million benefit realized in the note exchange that should be attributed as a benefit generated by Plaintiffs' lawsuit requires more details.

Plaintiffs are unable to determine from Harrah's public filings which percentage of the $66 million benefit and the $347 million in real value of New Notes were received by accredited investors and which were received by QIBs, much less by QIBs that owned Old Notes that were not accepted in the First Exchange.  Although Plaintiffs note that only approximately $6 billion in par value of the (then) total outstanding amount of approximately $11.12 billion in par value of Old Notes were tendered in the First Exchange — the implication being that the majority of the outstanding approximately $5 billion in par value of notes that were ***not tendered*** were held by retail and accredited investors, Plaintiffs believe that it would be proper to conduct discovery to determine the actual breakdown between the amount of accredited investors and QIBs that were benefited in

14

the Second Exchange.  *See In re First Peoples Bank S'holder Litig.*, 121 F.R.D. 219, 224 (D.N.J. 1988) ("any discovery process must be sufficient to ascertain with reasonable confidence that the petition is well-grounded in fact and not abusive.").

For that reason, Plaintiffs request leave to serve targeted interrogatories on Defendants in order to answer the questions related to the total number of retail and accredited investors that held Old Notes, as well as the number of accredited investors which benefitted from the Second Exchange Offer, the answers to which will allow this Court to properly calculate an award of attorneys' fees and expenses to Plaintiffs.[4]

Plaintiffs also request leave to serve requests for production of documents to Defendants for the Offering Memorandum for the Second Exchange Offer, including all supplements thereto.[5]

## H.      Plaintiffs' Lawsuit Had Merit

Despite conceding that it corrected the very wrongs alleged in Plaintiffs' lawsuit, Defendants nevertheless contend in their motion to dismiss that Plaintiffs' claims were deficient. [D.I. 19]. Defendants are mistaken, and each of their contentions is addressed, in turn, below:

### 1.      This Court Has Subject Matter Jurisdiction

#### a.      Federal Question

Defendants contend that there is no federal question presented by Plaintiffs' claims under the Trust Indenture Act, [D.I. 15, ¶¶94-101], because "plaintiffs have no claim unless their principal and interest are due under the terms of the Prior Indentures and Harrah's has not paid."  [D.I. 19, at p. 16].  But that is not true.

---

[4]      The proposed Interrogatories are attached hereto as **Exhibit "F."**

[5]      The proposed Document Request is attached hereto as **Exhibit "G."**

This Court has jurisdiction under the Trust Indenture Act, 15 U.S.C. §§77v(a), vvv(b).  The Act has a very specific purpose of preventing the type of unfair capital restructuring Defendants attempted with the First Exchange Offer:

> Enactment of Section 316(b) [of the Trust Indenture Act] is attributable to the Securities Exchange Commission's concern about the motivation of insiders and quasi-insiders to destroy a bond issue through insider control, and the generally poor information about a prospective reorganization available to dispersed individual bondholders.  In 1939, the Commission addressed this concern by seeking to have recapitalizations placed under regulatory and judicial control.  The Commission accordingly recommended to Congress legislation, in the form of Section 316(b), that would bring contractual recapitalizations under Bankruptcy Court jurisdiction.
>
> Section 316(b) tends to force recapitalizations into bankruptcy court by frustrating a distressed firm's efforts to successfully complete a consensual workout.  When a distressed or nearly bankrupt firm seeks to reorganize its financial structure, the incentives among those financially interested in the firm would generally be to contract to the efficient solution and avoid the transaction costs of a bankruptcy proceeding.  In a workout affecting bondholders, however, Section 316(b) tends to frustrate such a consensual workout.  By guaranteeing a bondholder's right to receive payment of the principal of or interest on the security, Section 316(b) creates a disincentive for bondholders to exchange their bonds for stock or for bonds with different terms.  Bondholders aware of the perceived advantage of refusing to participate in the workout-payment in full after, and if, the recapitalization succeeds-will do so, seeking to benefit from the workout at the expense of those who would renegotiate their credits or offer new capital.  The holdouts thus seek to be "buoyed-up" by the workout's participants.
>
> The "buoying-up" effect places the distressed firm under further stress.  In order to overcome the effect, nearly equal treatment of bondholders is necessary since equal treatment reduces the incentive for bondholders to hold out.  A reduced incentive to hold out enhances the firm's ability to achieve near unanimous agreement on the terms of any contemplated recapitalization and thereby increases the chances of a successful consensual workout.  *Without equal treatment of creditors, the near consensual unanimity necessary for a successful workout is frustrated by holdouts and the buoying-up effect, and the workout fails.  The Securities Exchange Commission was undoubtedly aware that requiring unanimity in bondholder voting-rather than mere majority action-would frustrate consensual workouts and help induce bankruptcy.  And convinced that insiders or quasi-insiders would damage bondholders, the Commission welcomed the prospect.*

*UPIC & Co. v. Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 452-53 (S.D.N.Y. 1992).

Plaintiffs alleged that, in violation of the Trust Indenture Act, Defendants impaired Plaintiffs' rights under the bond agreements and did not act prudently by subordinating the Old Notes with the New Notes without first achieving consent from Plaintiffs.  [D.I. 15, ¶¶94-101].  In other words, Plaintiffs claimed that the Trust Indenture Act precluded Defendants from lowering the priority status of the Old Notes without Plaintiffs' consent.  Indeed, Defendants' statement in the confidential offering memorandum, mentioned above in **Section II.C.**, about the adverse effect on the Old Notes speaks for itself.

*Federated Strategic Income Fund v. Mechala Group Jamaica Ltd.*, No. 99 CIV 10517 HB, 1999 WL 993648, at *1 (S.D.N.Y. Nov. 2, 1999), is directly on point, and because Defendants neglect to even acknowledge this case, the facts and holding in *Mechala* are set forth in detail below:

### (1)   The Exchange Offers at Issue in *Mechala*

In *Mechala*, the plaintiff owned bonds offered by the defendant corporation.  However, the defendant "began suffering from financial setbacks" and "realized that it could not repay the full principal amount of the [bonds]."  *Mechala*, 1999 WL 993648, at *1.  The defendant corporation thus devised "a cash tender offer for the [bonds]."  *Id*.

Under the terms of the defendant's offer, the defendant agreed to purchase the bonds "at $351.57 per $1000 in principal and accrued interest."  *Id*.  The offer "would be consummated if a majority of holders tendered their Notes, as well as consented to certain proposed amendments to the indentures which were outlined in the offer."  *Id.*

Nevertheless, during the pendency of the offer, a committee formed by the defendant "decided that the offer was inadequate and sought to negotiate a higher price for the notes."  *Id*. at *2.  The offer was then rescinded and reformulated. *Id*.

The reformulation was styled as "Amendment to Offer to Purchase for Cash and Consent Solicitation," which kept most of the terms the same and increased the "offer consideration to $450

per $1000 of principal (45¢ on the dollar), and, [in addition], offered a Consent Payment in the aggregate amount of $2 million, which was to be paid on a pro rata basis to holders who tendered their notes and consented to the amendments on or before [the deadline]." *Id*. at \*3. Yet, the notes held by the defendant company and its affiliates were excluded from the offer. *Id*. Importantly, moreover, the offers eliminated several restrictive covenants from the bonds, including those related to "certain events of default" and the guarantee of the notes related to "defendant's subsidiaries," and converted the defendant company into "a holding company whose only assets will be a nominal amount of cash and other assets." *Id*. at \*4.

**(2)**      **The Parties' Arguments Regarding the Legality**
**of the Exchange Offers**

The plaintiff in *Mechala* filed a "complaint for preliminary and permanent injunctive relief, and a declaratory judgment, alleging that the tender offer violates the indentures, ***the Trust Indenture Act of 1939***, and the disclosure laws for tender offers." *Id*. at \*3-\*4.

At the hearing on the motion, a member of the committee formed by the defendant to fashion the exchange offers testified that: a) only institutional holders of the bonds, and not individual holders, were represented by the committee; b) other than the bond holders, no creditors of the company were "being asked to take a 55% discount on their debt"; and c) the company's "intent" behind the exchange offers was "to repay its other creditors in full." *Id*. at \*4-\*5.

With that testimony as supporting evidence, the plaintiff claimed that the exchange offers violated the Trust Indenture Act because "the indentures require, by their terms, unanimous consent of all holders when certain rights under the contract are 'impaired,' namely the right to receive payment of principal and the right to institute suit for the enforcement of payment." *Id*. at \*5.

18

The defendant argued, in contrast, as Defendants do here, that the exchange offers did not require unanimous consent from bond holder because the exchange offers did not "impair" any rights. *Id.* at *6.

Judge Baer framed the issue as follows:

The question for this Court then is whether the offer and its proposed amendments impair the right to receive payment or impair the right to sue for the enforcement of any such payment. Or, put another way, does a plain reading of the indentures and the ***application of the Trust Indenture Act*** require unanimous consent of all the affected holders?

*Id.*, at *6.

### (3)    Judge Baer's Analysis

Important to Judge Baer was the fact that the exchange offers would "include stripping certain restrictive covenants in the indentures, such as maintaining an agent for service in New York, jurisdictional provisions, waiver of immunities, and events of default." *Id.* As a result, he concluded that there was "no meaningful recourse for plaintiffs or any noteholder who concludes this is a bad deal and chooses not to tender their notes, but rather to wait and sue for payment upon maturity." *Id.*

Moreover, Judge Baer found that the exchange offers were inextricably-linked to the defendant company's planned reorganization and, for that reason, "a proposed amendment that impairs or affects, by its effect and not necessarily by its terms, a holder's right to sue and recover payment could in certain circumstances constitute a violation." *Id.*, at *7.

Therefore, Judge Baer concluded:

A holder who chooses to sue for payment at the date of maturity will no longer, as a practical matter, be able to seek recourse from either the assetless defendant or from the discharged guarantors. It is beyond peradventure that when a company takes steps to preclude any recovery by noteholders for payment of principal coupled with the elimination of the guarantors for its debt, that such action does not constitute an "impairment" or "affect" the right to sue for payment.

*Id.*, at *7.

19

In addition, Judge Baer found that even though the defendant claimed that it had obtained

consent for the exchange offers by 77% of the bond holders and that obtaining the remaining 23%

"may be a practical impossibility," unanimous consent from 100% of the bondholders was required

because "it is still the law that there is no inherent right to proceed with an unlawful tender offer if a

violation of the indentures has in fact occurred." *Id.*

### (4)    Application of *Mechala* Here

*Mechala* is on all-fours with this case.  In *Mechala*, institutional investors, to the exclusion

individual investors, were represented by the committee formulating the exchange offers.  Here, the

First Exchange Offer was only given to those individuals and entities which Harrah's unilaterally

determine are qualified to participate, *i.e.*, QIBs representing approximately $2.21 billion in Old

Notes.  As in *Mechala*, the First Exchange Offer impaired the rights of Plaintiff and the putative

Class under the Trust Indenture Act because their bonds were subordinated by the New Bonds

offered in the exchanges, and because the QIBs that were able to participate exchanged under

coercive terms.  *See also Oaktree Capital Mgmt., LLC v. Spectrasite Holdings, Inc.*, No. Civ.A. 02-

548 JJF, 2002 WL 32173072, at *4 (D. Del. June 25, 2002) ("Should Defendants file a bankruptcy

action, a court may find that the Tender Offer Transactions, entered into at a time near the

bankruptcy, impaired the rights of the Indentures by incurring significant senior debt."); *cf. Mann v.

Oppenheimer & Co.*, 517 A.2d 1056, 1062 (Del. 1986) (genuine issue of fact as to whether company

would actually redeem the bonds pursuant to an exchange offer).

Therefore, Plaintiffs' claim under the Trust Indenture Act, like the claim in *Mechala*, was

meritorious.

### b.    Diversity Jurisdiction

Defendants also contend that this Court did not have diversity jurisdiction under 28 U.S.C.

§1332 because Plaintiffs alleged that they were "residents," not "citizens," of the state of Arkansas.

[D.I. 15, ¶¶7-8]. Defendants also claim that there was not a sufficient allegation of the Defendants' citizenship. For those reasons, Defendants contended that this Court should "dismiss the Amended Complaint for lack of subject matter jurisdiction." [D.I. 19, at p. 18]. The argument is absurd.

Not only does this Court also has *federal question* jurisdiction under the Trust Indenture Act and 28 U.S.C. §1331, as Defendants themselves acknowledge, Plaintiffs clearly allege that "they are citizens of states different from Defendants." [D.I. 19, at p. 17]. Defendants would have this Court not accept the plain allegation that there is diversity and *dismiss this case* because Plaintiffs allege residency in the state of Arkansas, not citizenship. Not even the authority upon which Defendants purport to rely, *Duruaku v. BB&T Bank*, Civil Action No. 05-5285(KSH), 2006 WL 1805887, at *1 (D.N.J. June 29, 2006), would support such a ruling. In *Duruaku*, the court did not dismiss the action, but instead found that the party should "provide the Court with a statement of the citizenship" and directed "that BB & T support its jurisdictional assumptions by such means as the Magistrate Judge directs, within a time frame to be set by the Magistrate Judge." *Id.*, at *5-*6.

Thus, for the sake of any further argument, Plaintiffs attach hereto the sworn declaration of Plaintiff Murchison stating that he is a *citizen* of the state of Arkansas. *See* Declaration of S. Blake Murchison, attached hereto as **Exhibit** "**H**."

To the extent that Defendants would still maintain that any of them are also citizens of the state of Arkansas (which they have not done, despite making the argument that there is no diversity jurisdiction), Defendants are free to provide a "statement of citizenship" under *Duruaku*. But without such a statement or other discovery on the citizenship of the Defendants, there is nothing to rebut Plaintiffs' allegation in the Amended Complaint that Defendants are not citizens of the same state as Plaintiffs, *i.e.*, Arkansas—an allegation that Defendants acknowledge. Indeed, if Defendants still maintain that diversity jurisdiction was not sufficiently demonstrated, jurisdictional discovery

would then be necessary. *See Emerald Investors Trust v. Gaunt Parsippany Partners*, 492 F.3d 192, 206-208 (3d Cir. 2007).

### c.      Supplemental Jurisdiction

Defendants also contend that this Court did not have supplemental jurisdiction over this case because, according to Defendants, there was neither federal question or diversity jurisdiction. [D.I. 19, at pp. 18-19].  As addressed immediately above, that contention is false.  *Mechala* demonstrates that Plaintiffs properly stated a claim under the Trust Indenture Act arising from the subordination of Old Notes without bondholder consent and the coercive exchanges; and, Plaintiffs have unrebutted allegations in the Amended Complaint that the Defendants are not citizens of the state of Arkansas. Moreover, if Defendants still maintain that diversity jurisdiction is not sufficiently demonstrated, jurisdictional discovery would be necessary.

### 2.      Plaintiffs Have Standing

Defendants contend that Plaintiffs did not have standing to sue on behalf of the retail investors, the accredited investors, and the QIBs which were denied access to the First Exchange Offer, or on behalf of the QIBs which tendered their bonds in the First Exchange.  The arguments were three-fold.  First, Defendants contend that the indentures themselves have a "limitation on suits" provision that bars this lawsuit.  Secondly, Defendants contend that Plaintiffs cannot bring a class action on behalf of all of the bondholders uniformly affected by the First Exchange Offer because the Plaintiffs did not personally own each and every series of the Old Notes.  Third, Defendants contend that the QIBs that exchanged their Old Notes have no rights asserted herein.

Defendants were mistaken on every point.

a. The "Limitation on Suits" Provisions in the Indentures
Did Not Bar Plaintiffs' Lawsuit

Defendants contend that the "limitation on suits" provisions contained within the indentures

prohibit this litigation because the indentures required a pre-suit demand on Defendants. [D.I. 19, at

pp. 19-20]. However, Defendants neglect to recognize or acknowledge the language in the

"limitation on suits" provision of the indentures that ***immediately follows and qualifies*** the pre-suit

demand procedures:

> [I]t being understood and intended that no one or more of such Holders shall have
> any right in any manner whatever by virtue of, or by availing of, any provision of this
> Indenture to affect, disturb or prejudice the rights of any other of such Holders, or to
> obtain or to seek to obtain priority or preference over any other of such Holders or to
> enforce any right under this Indenture, except in the manner herein provided and for
> the equal and ratable benefit of all such Holders.

[D.I. 20-2, at p. 52].

This passage is subsequent to and serves as an exception to any "limitation on suits" or pre-

suit demands. Moreover, the unfair subordination at issue in the First Exchange Offer addressed in

Plaintiffs' lawsuit is exactly the type of "prejudice" and other wrongful conduct referred to in the

passage. Put differently, the indenture itself defined this exact lawsuit as an exempt from any pre-

suit demand.[6] Moreover, to the extent that there would be any ambiguity about the scope of the

"limitation on suits" provisions, it could not be resolved on the pleadings and would require

evidence that is extrinsic to the operative complaint. *See*, *e.g.*, *Wing Ming Props.*, *Ltd. v. Mott*

*Operating Corp.*, 568 N.Y.S.2d 605, 606 (N.Y. App. 1991) (summary judgment review and extrinsic

evidence used to determine indenture); *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 88

---

[6] The "limitation on suits" provision is also qualified by the "Unconditional Right of Holders
to Receive Principal and Interest" provision, which provides, among other things, "that the Holder of
any Notes shall have the right, which is absolute and unconditional, . . . to institute suit for the
enforcement of any such payment." [D.I. 20-2, at pp. 52-53].

F.R.D. 38, 43 (S.D.N.Y. 1980) ("The provisions of the Indentures are not 'wholly unambiguous';

Sharon therefore has a right to 'present oral testimony or other extrinsic evidence at trial to aid in

interpreting' those provisions."); *In re Kaiser Aluminum Corp.*, 380 B.R. 344, 247 (Bankr. D. Del.

2008) ("Reviewing the decision of the Bankruptcy Court in light of the applicable standard of review

and the governing legal principles, the Court concludes that the Bankruptcy Court did not err in its

interpretation of the 1993 Indenture and did not err in considering extrinsic evidence to reach that

interpretation."); *In re Oakwood Homes Corp.*, No. 02-13396(PJW), 2004 WL 2126514, at *4

(Bankr. D. Del. Sept. 22, 2004) ("For purposes of the summary judgment motion, I simply conclude

that Babson asserts a claim that is not barred by the no-action clause of the PSA.").

Furthermore, and regardless of the qualifications to the "limitation on suits" provision

contained within the indenture agreements, the provision would not have served as a bar to this Trust

Indenture Act case.  As a practical matter, Defendants have themselves admitted that they corrected

the wrongs in Plaintiffs' lawsuit. [D.I. 19, at p. 25].  Thus, pre-suit notice would have had no effect

on Defendants and it would be otherwise inequitable to enforce that provision now.  *Accord Metro.*

*W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*, No. 03 Civ. 5539(NRB), 2004 WL 1444868, at *5

(S.D.N.Y. June 25, 2004) ("Shenkman is thus not shielded from suit in this circumstance.  By suing

Shenkman and JPMC, plaintiff is not trying to avoid or circumvent other noteholders' priority of

payment.  Accordingly, the 'no action' clause in the Indenture is simply inapplicable here.  Plaintiff

is entitled to bring this suit.").

Indeed, courts routinely refuse to enforce "limitation on suits" provisions where Trust

Indenture Act claims are at issue.  *See, e.g.*, *Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir.

1992) ("Because the claims against the Trustees are not for non-payment of principal or interest as

such, but rather assert breaches of the Trust Indenture Act and the Indentures, [the "limitation on

suits" provision] is irrelevant in assessing when plaintiffs' causes of action against the Trustees accrued."); *UPIC & Co.*, 793 F. Supp. at 454-55 (holding that "limitation on suits" provision "has no applicability to actions brought under [the Trust Indenture Act]); *Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 991 (8th Cir. 2007) ("The question is whether the no-action clause or the [Trust Indenture Act] is controlling with respect to the annual interest owed on the debentures. We hold that [the Trust Indenture Act] grants Great Plains the absolute right to sue for unpaid interest without having to first comply with the no-action clause."); *Semi-Tech Litig., LLC v. Bankers Trust Co.*, 272 F. Supp. 2d 319, 329 n.51 (S.D.N.Y. 2003) (stating that "limitation on suits" clause would not have barred Trust Indenture Act claim); *accord McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1051 (2d Cir. 1995) ("the district court properly found that actions based on federal securities laws may not be precluded by the no-action clause.").

> **b.    Plaintiffs Properly Challenged the First Exchange Offer on Behalf of Holders Not Offered the Ability to Exchange Their Old Notes**

In terms of Plaintiffs' claim regarding all bondholders that were unfairly excluded from being able to have their Old Notes accepted in the First Exchange Offer: Defendants contend that Plaintiffs did not have standing to challenge the First Exchange Offer on behalf of the bondholders for each of the Old Notes, but only standing to sue on behalf of the bondholders that own the Old Notes that Plaintiffs separately and individually own. [D.I. 19, at pp. 21-23].  However, Defendants' contention would have only been appropriate at the class certification stage, at which time this Court would have determined whether all of the bondholders of the ten series of Old Notes that were uniformly subordinated by the First Exchange Offer could be properly certified under Federal Rule of Civil Procedure 23.  *But see Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 554 n.4 (D. Colo. 1998) (no impediment to class certification that stockholder only bought shares pursuant to one of two public offerings).

Nor can Defendants' contention be squared with its other position that the "limitation on suits" provisions in the indenture agreements serve as a bar to this lawsuit, which is addressed immediately above in **Section II.H.2.a**.  To be sure, Defendants themselves took that position regarding the "limitation on suits" provision and contend that each indenture provision in each of the Old Notes *applied equally*.  [D.I. 19, at pp. 19-20].  Defendants contend that Plaintiffs should have given a pre-suit demand before filing this lawsuit *for each of the ten series of Old Notes that were uniformly subordinated by the First Exchange Offer*.  This contention directly contradicts Defendants' other position that Plaintiffs do not have standing to sue on behalf of the holders of the Old Notes that the Plaintiffs do not own.

Indeed, in the confidential offering memorandum (referred to above in **Section II.C**.) that Defendants provided to the QIBs group all of the Old Notes together and *did not distinguish* among any of the Old Notes.  [*See*, *e.g.*, [D.I. 20-10, at p. 31] ("The market prices for the non-tendered or not accepted Old Notes may also be negatively affected by this effective subordination to the New Second Lien Notes.")]

> **c.** **Plaintiffs Properly Challenged the First Exchange Offer on Behalf of Holders That Were Able to Exchange Their Old Notes Based on Coercion**

In terms of Plaintiffs' claim regarding bondholders that were able to exchange their Old Notes, but did so only because the First Exchange Offer was coercive: Defendants contend that Plaintiffs did not have standing to sue on their behalf because those bondholders "themselves" lacked standing after having exchanged their Old Notes.  [D.I. 19, at pp. 23-24].  That is wrong.

Plaintiffs' lawsuit sought damages, and/or rescission of the First Exchange Offer, and/or for Defendants to be forced to allocate more capital in a new exchange.  These were remedies for the bondholders which exchanged their Old Notes, as well as the other bondholders.  The fact that the bondholders tendered their Old Notes does not extinguish their right to sue regarding the First

Exchange Offer, which was alleged to have been coercive.  *See, e.g.*, *McMahan & Co.*, 65 F.3d at 1050 ("In this case, plaintiffs purchased debentures, allegedly relying in part on the possibility that a merger that was not approved by the Independent Directors might occur and thus trigger the right to tender.  This possibility, we have previously held, could reasonably be considered a 'valuable right' to plaintiffs."); *accord Joseph v. Shell Oil Co.*, 482 A.2d 335, 345 (Del. Ch. 1984) (Those stockholders who have tendered must be given an opportunity to withdraw their shares, if they desire, after the supplemental disclosure is made.").

Whether the First Exchange Offer was coercive beyond what Plaintiffs alleged in the operative complaint could not be determined at the pleading stage.  *See, e.g.*, *Gradient OC Master, Ltd. v. NBC Universal, Inc.*, 930 A.2d 104, 116-17 (Del. Ch. 2007).

### 3.     Plaintiffs' Contract Claims Were Well-Founded

#### a.     Breach of the Indenture

As stated above, the First Exchange Offer materially affected the value of the Old Notes by issuing New Notes that subordinated the Old Notes, and Defendants ***admitted this*** in the confidential offering memorandum to the QIBs cited above.  The parties have two different interpretations of whether the bond indentures permitted Defendants to subordinate the Old Notes.

#### (1)     Plaintiffs' Interpretation

As stated above, the following provisions would prohibit the unfair bondholder discrimination that took place in the First Exchange Offer:

> [I]t being understood and intended that no one or more of such Holders shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other of such Holders, or to obtain or to seek to obtain priority or preference over any other of such Holders or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all such Holders.

[D.I. 20-2, at p. 52].

The following other provision in the indentures would prohibit the unfair subordination as well:

> Neither the Company nor any of its subsidiaries may issue, assume or guarantee any Indebtedness secured by a Lien upon any Consolidated Property or on any Indebtedness or shares of capital stock of, or other ownership interests in, any Subsidiaries (regardless of whether the Consolidated Property, Indebtedness, capital stock or ownership interests were acquired before or after the date of the Indenture) without effectively providing that the notes shall be secured equally and ratably with (or prior to) such Indebtedness so long as such Indebtedness shall be so secured . . .

[D.I. 20-17, at pp. 62-63].

### (2)      Defendants' Interpretation

In their purported justifications for the First Exchange Offers *vis-à-vis* the indentures, Defendants contend that the New Notes were permissible under the "Permitted Liens" provisions which allowed for "Senior Debt."  Defendants then argue that the New Notes were precisely that – Senior Debt – because, circularly, the New Notes were "senior and secured." [D.I. 19, at p. 29].

Defendants also contend that the following language in the indentures regarding "Limitations on Liens" allowed for the New Notes:

> [T]he Company and any one or more of its Subsidiaries may, without securing the Notes, issue, assume or guarantee Indebtedness which would otherwise be subject to the foregoing restrictions in an aggregate principal amount which, together with all other such Indebtedness of the Company and its Subsidiaries which would otherwise be subject to the foregoing restrictions (not including Indebtedness permitted by the preceding paragraph) and the aggregate Value of Sale and Lease-Back Transactions (other than those in connection with which the Company has voluntarily retired Funded Debt) does not at any one time exceed 15% of Consolidated Net Tangible Assets of Harrah's Operating and its consolidated Subsidiaries.

[D.I. 19, at pp. 29-30].

Defendants first contend that the language allowed for the New Notes since it allowed for Defendants to use the New Notes "in part to retire the Senior Notes and Toggle Notes" and since (citing another portion of the indentures) the New Notes were "pari passu" with the Senior Notes and Toggle Notes.

- ***Nota Bene***: The other portion of the indentures Defendants cite is the voluminous definition section. [D.I. 19, at pp. 29-30]. However, Defendants do not specify which of the many definitions apply. Presumably Defendants refer to the "Funded Debt" definition because that definition contains the language "ranks at least pari passu" – the term 'pari passu' meaning 'at an equal rate or pace.'[7]

- Defendants conclude, with no explanation, that the "New Debt" is in pari passu with "the notes." *See In re KTMA Acquisition Corp*., 153 B.R. 238, 263 n.26 (Bankr. D. Minn. 1993) ("***Inane use of Latin is not impressive***. "Pari passu" means: By equal progress; equably; ratably; without preference. Used especially of creditors who, in marshalling assets, are entitled to receive out of the same fund without any precedence over each other. ***The readers of this opinion should not be burdened like I was.  Goins' assertion could have been easily explained in English***.").

- Moreover, the offering memorandum itself clearly states that "New Notes" are ***not*** in pari passu with "subordinated indebtedness." [D.I. 20-10, at p. 23]. Nor do Defendants specify whether they contend that "the notes" to which Defendants refer are in pari passu with "the New Debt" are all the Old Notes or solely the "Senior Notes and Toggle Notes," or how it is possible for "New Debt" to be in pari passu with retired debt or subordinated Old Notes. *See, e.g., JMF Consulting Group II, Inc. v. Beverage Mktg. USA, Inc*., No. 11005/08, 2009 WL 279302, at *3 (N.Y. Sup. Feb. 04, 2009) ("***In order to treat all shareholders fairly***, pari passu provisions, requiring proportional repayment of all shareholder loans, are frequently included in shareholder agreements.");  *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co*., No. 1:08CV1560-DFH-DML, 2008 WL 5216027, at *6 (S.D. Ind. Dec. 11, 2008) ("The mortgage is shared because John Hancock stands 'pari passu' or ***'shoulder to shoulder' with two other creditors with legally equivalent interests.***"); *AWG Leasing Trust v. United States*, 592 F. Supp. 2d 953, 968 (N.D. Ohio 2008) ("The loans are pari passu, ***meaning that they are secured by the same collateral***"); *Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B*., 954 F. Supp. 438, 443 n.3 (D.P.R. 1996) ("In pari passu means 'in equal step.'  In other words, ***the loans would have the same priority***."). Likewise, the confidential offering memorandum states: "The New Second Lien Notes do not benefit from the provisions of the intercreditor agreement governing the Old Cash Pay Notes and the Old Toggle Notes and would not be entitled to be paid in full before any payment may be made with respect to the Old Cash Pay Notes or the Old Toggle Notes."  [D.I. 20-10, at p. 34].

---

[7]  *See* http://www.merriam-webster.com/dictionary/pari+passu (last visited June 4, 2009).

- Defendants use the term "New Debt" instead of using the term "New Notes," as they do elsewhere, regarding their contention of pari passu and do not explain the difference between "New Debt" and "New Notes."

- The definition of "Funded Debt" under the indentures also requires that the debt "matures by its terms on, or is renewable at the option of any obligor thereon to, a date more than one year after the date of original issuance of such Indebtedness." [D.I. 19, at pp. 29-30]. Defendants neglect to contend that the "New Debt" or "New Notes" comply with this necessary provision regarding maturity, much less contend how.

Defendants further contend that the "Limitations on Liens" language provides for an "exception" for Harrah's to "issue debt of whatever type 'not including Indebtedness permitted' (*i.e.*, beyond the Indebtedness discussed above that must at least be as senior as the Senior Notes or extend any lien to all debt equally)," which Defendants contend means the New Notes since "that portion of the New Notes that retired the Senior Subordinated Notes is significantly less than 15% of the Company's Consolidated Net Tangible Assets."

- ***Nota Bene***: The section provides that the 15% rule applies at any one time and Defendants neglect to contend compliance with this rule at all times.

### (3) *Realogy*

Of critical importance is that Defendants neglect to acknowledge the leading case on this exact issue of whether "Permitted Liens" allow for this type of bondholder discrimination *vis-à-vis* an exchange offer, *Bank of N.Y. Mellon v. Realogy Corp.*, C.A. No. 4200-VCL, 2008 WL 5259732, at *1 (Del. Ch. Dec. 18, 2008).

In *Realogy*, the trustee of certain bond holders sued the defendant company as a result of the company's proposed exchange offers. The company was "offering holders of the [company's] unsecured indebtedness the opportunity to exchange notes for participation in a new term loan facility secured by a second lien on its assets." *Id.* at *1. Certain bond holders, *via* their trustee, objected "to the terms of the exchange offer because it discriminates against them in favor of holders

of other classes of unsecured notes that pay interest in cash . . . [and] would violate the terms of that indenture." *Id.*

The issue in the case was whether the exchange offers constituted a "Permitted Lien" under the terms of the bond indentures, and "whether the proposed borrowing satisfies the definition of Permitted Refinancing Indebtedness found in the bank credit agreement incorporated by reference into that indenture." *Id.*

Vice Chancellor Lamb first noted that the indentures restricted the defendant company's "right to grant or suffer the existence of liens." *Id*. at *4.  Specifically, he found that to "the extent that liens are created in favor of indebtedness which is *pari passu* to the [Notes, the Notes] must be granted equal and ratable liens." *Id*. at *4.

Vice Chancellor Lamb then interpreted the plain language of the documents and found that the exchange offers were not Permitted Liens because the documents prohibited "the granting of greater security to the Permitted Refinancing Indebtedness than the indebtedness being refinanced had." *Id*. at *9.[8]  Therefore, the court concluded:

> As a result, the refinancing of the Senior Notes with Second Lien Term Loans does not qualify as Permitted Refinancing Indebtedness. . . . The creation of these liens is therefore not exempted from the requirements of Section 4.12 of the Indenture.  As such, the proposed transaction if consummated will constitute a breach of the Indenture.

*Id.*, at *10.

### (4)   Application of *Realogy*

Defendants' interpretation of the indenture agreements is belied by their failure to address the provisions referred to above and failure to even cite *Realogy* to this Court.  Indeed, in the context

---

[8]      As stated above, the New Notes were given greater security than and otherwise subordinated the Old Notes.

of *Realogy*, Defendants' interpretation of why Defendants were permitted to conduct the First Exchange Offer by discriminating against and subordinating the bonds of holders of Old Notes without their consent is tortured because of: a) Defendants' circular analysis as to why the New Notes would properly be considered "Senior Debt"; and, among other reasons, b) Defendants' incomplete justification of the New Notes under the "Limitations on Liens" section by 1) Defendants' lack of clarity on which definition in the voluminous definition section Defendants rely, 2) Defendants' failure to explain the difference between "New Debt" and "New Notes," 3) Defendants' failure to explain with which notes the "New Debt" is in pari passu, 4) Defendants' failure to explain how it is possible for the "New Debt" to be in pari passu (*i.e.*, "in equal step") with retired debt or subordinated debt, 5) Defendants' failure to contend that the "New Debt" meets the maturity requirement for "Funded Debt, and 6) neglect to contend compliance with the 15% rule at all times.  Nor are the indentures susceptible to interpretation without extrinsic evidence, especially in light of Defendants' own acknowledgment of the detrimental effect that the First Exchange Offer would have on the Old Notes.

### b.      Breach of the Implied Covenant of Good Faith and Fair Dealing

Defendants contend that the complaint does not allege the elements for a claim under the implied covenant of good faith and fair dealing. [D.I. 19, at pp. 33-35].  Defendants are wrong. A cause of action under the implied covenant of good faith and fair dealing obtains "when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Fourth Branch Assocs. Mechanicville v. Niagara Mohawk Power Corp.,* 653 N.Y.S.2d 412, 416 (N.Y. App. Div. 1997).

Plaintiffs allege that Defendants' First Exchange Offer unfairly excluded holders of approximately $9 billion in par value of Old Notes by not allowing those holders to exchange their Old Notes for cash or New Notes, and by subordinating their Old Notes to the New Notes that were issued in the exchange to a small subset of similarly-situated holders of Old Notes; and was otherwise a coercive tender offer to those holder of Old Notes that were accepted in the exchanges.

The allegations fall under implied covenant of good faith and fair dealing because Defendants deprived the bondholders of their rights "to receive the benefits" under their indentures—and the Defendants' own confidential offering memorandum referred to in **Section II.C.** above articulates exactly how, [D.I. 20-10, at p. 31]. *See*, *e.g.*, *Hackettstown Nat'l Bank v. D.G. Yuengling Brewing Co*., 74 F. 110, 113-14 (2d Cir. 1896) ("[I]t must be held that, if the consent was made and the resolution passed by the majority of bondholders, not in the common interest of all, but in the interest of Yuengling, with a view of enabling him, by deferring for five years the payment of interest, to compel the minority bondholders to sell their bonds on such terms as he might dictate, it was a corrupt and unwarranted exercise of the power of the majority."); *In re Bd. of Dirs. of Multicanal S.A*., 340 B.R. 154, 157-180 (Bankr. S.D.N.Y. 2006) ("The Court held that while Multicanal had justified its decision to offer U.S. retail holders only cash-in order to avoid a U.S. securities law problem-it had not justified the disparity in the amount of cash offered as compared to the value of the packages offered to large holders (as well as holders outside the United States). The Court rejected the relief recommended by the objecting noteholders, which was to deny recognition of the APE altogether. It found that there were or appeared to be at least two possible remedies: to give the U.S. retail holders the same choice among securities and cash that all other holders had, or to increase the value of the cash option.").

Defendants also contend that Plaintiffs cannot allege their Count for breach of the implied covenant of good faith and fair dealing because it would be duplicative of the breach of contract Count.  [D.I. 19, at p. 35].  That is also wrong.  Rule 8 would permit Plaintiffs to plead their Count for breach of the implied covenant of good faith and fair dealing in the alternative to their Count for breach of contract.[9]

For instance, the court in *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.,* 341 F. Supp. 2d 258, 272 (S.D.N.Y. 2004), used Rule 8 to reject the same contention Defendants make here:

> CSFB next argues that Xpedior's claim for breach of the implied covenants of good faith and fair dealing fail because, as a matter of New York law, the same operative facts cannot simultaneously give rise to claims for both implied and express covenants.  This is certainly an accurate statement of the law, and Xpedior does not contest that its good faith claims are indistinguishable from its contract claims.

> It does not follow, however, that this claim must be dismissed. To the contrary, the Federal Rules explicitly permit a party to plead causes of action in the alternative, regardless of consistency.  Thus, while Xpedior may not press both claims to judgment, it is free to litigate both.

Moreover, contrary to Defendants' contention, Plaintiffs' Count for breach of the implied covenant of good faith and fair dealing does not "duplicate[]" their Count for breach of contract. [D.I. 19, at p. 35].

---

[9]    Rule 8(a)(3) provides that, in a complaint, "a demand for the relief sought, which may include relief in the alternative or different types of relief."  Section (d) goes on to provide, in pertinent part, that a complaint may also contain:

> (2) Alternative Statements of a Claim or Defense. A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.

> (3) Inconsistent Claims or Defenses. A party may state as many separate claims or defenses as it has, regardless of consistency.

**Plaintiffs' Count for Breach of Contract**

83. Each of the Indentures provides that Harrah's shall not issue, assume or guarantee any debt secured by the [respective] notes without effectively providing that the notes shall be secured equally and ratably with such debt. The Exchange Offers violated that provision of the Indentures because the New Notes are not secured equally and ratably with the Old Notes.

84. Each of the Indentures provides that Harrah's triggers default when Harrah's generally is not paying its debts as the same become due. The Exchange Offers trigger a default under that provision of the indenture agreements because the New Notes subordinate the Old Notes and there is a substantial likelihood that Harrah's will not be able to pay the Old Notes when they become due.

85. Each of the Indentures provides that Harrah's cannot reduce the rate of or extend the time for payment of interest on the [respective] notes or reduce the principal or change the stated maturity of the [respective] notes, without the consent of affected noteholders. The Exchange Offers violated that provision of the Indentures because the Old Notes are subordinated to the New Notes, there is a substantial likelihood that Harrah's will not be able to pay the Old Notes when they become due, and because Harrah's did not obtain the consent of Plaintiffs or other affected noteholders to the Exchange Offers.

[D.I. 15, ¶¶83-85].

**Plaintiffs' Count for Breach of the Implied Covenant of Good Faith and Fair Dealing**

89. Each of the Indentures imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement with respect to all of Harrah's bond holders, including QIBs, accredited investors, and lay, retail investors.

90. In addition to what is alleged above, Defendants did not engage in good faith and fair dealing in the performance and enforcement of the Indentures by, in the face of certain bankruptcy, debt default and other events of insolvency, attempting to unilaterally and arbitrarily cherry-pick among its bond holders and only honor Harrah's debt obligation to a limited number of those bond holders by subordinating the Old Notes in favor of the New Notes.

91. Likewise, as to the QIBs offered the exchanges, Defendants did not engage in good faith and fair dealing in the performance and enforcement of the Indentures by creating unfair and inadequate exchange ratio caps for the bond priority levels and by not allocating sufficient capital to the exchange offers such that the exchange ratios were ultimately inadequate as compared to the value of the QIBs Old Notes.

92. Moreover, Defendants did not engage in good faith and fair dealing in the performance and enforcement of the Indentures by excluding and rejecting QIBs that validly tendered their Old Notes in the Exchange Offers.

[D.I. 15, ¶¶89-92].

Indeed, Plaintiffs comport their claims with the allegations that were upheld in the authority upon which Defendants themselves rely.  *See JPMorgan Chase Bank, N.A. v. IDW Group, LLC*, No. 08 Civ. 9116(PGG), 2009 WL 321222, at *7 (S.D.N.Y. Feb. 09, 2009) ("The Complaint adequately alleges that IDW deprived it of the benefits of the Agreements" by failing to disclose its retention to poach Edsparr. . . . Accordingly, this Court denies IDW's motion to dismiss the claim that IDW breached the implied covenant by failing to inform JPMorgan that it had been retained by Citadel to recruit Edsparr on Citadel's behalf.").

### 4.    Plaintiffs' Claim for Equitable Rescission Was Well-Founded

Defendants contend that Plaintiffs did not properly state a claim for equitable rescission because: a) the claim was not explicitly pled in the alternative to Plaintiffs' other claims and that , as a result, Plaintiffs have an adequate remedy at law; and, b) "there has been no breach of contract, and the Company only acted unto the Bondholders in accord with the Prior Indentures." [D.I. 19, at pp. 35-37].  Defendants are mistaken.

A fair reading of Plaintiffs' lawsuit is a prayer for damages and/or equitable relief in the form of rescinding the exchanges.  [*See*, *e.g*., [D.I. 15, ¶73 ("(d) Whether Plaintiffs and the other members of the class are entitled to damages and the proper measure of such damages; (e) Whether the Exchange Offers should be rescinded")].  Rescission of the exchanges in the First Exchange Offer is a form of equitable relief.  *See*, *e.g*., *Nicholson v. Aesthetique, Ltd*., No. 18042-03, 2009 WL 348293, at *6 (N.Y. Sup. Jan. 26, 2009) ("He might bring an action in equity to rescind the contract and in that action in equity have full relief."); *Ajettix Inc. v. Raub*, 804 N.Y.S.2d 580, 585 (N.Y. Sup. 2005) ("Plaintiffs have moved for summary judgment on their claim for equitable relief, seeking judgment as a matter of law rescinding the transaction on the ground of breach of fiduciary duty."); *Creative Research Mfg. v. Advanced Bio-Delivery LLC*, No. Civ.A. 1211-N, 2007 WL 286735, at *10 (Del. Ch. Jan. 30, 2007) ("In summary, with regard to the equitable rescission CRM requests, the Court will rescind the Alliance Agreement, order all technology and intellectual property CRM provided to ABD/PSI returned to CRM's title and possession and award monetary relief in the amount of $248,807.02."); *Hynson v. Drummond Coal Co.,* 601 A.2d 570, 575 (Del. Ch. 1991) ("If the Drummond tender offer had been determined to constitute a violation of fiduciary duty by the directors or by the controlling shareholder, a number of remedies might have been available-rescission, payment of "damages" to raise the price paid to a "intrinsically fair" price, or constructive

trust-but in each case the particularities of any holder would have no bearing on the appropriate remedy.").

This fair reading of the lawsuit is required so as to do "substantial justice" under Rule 8(f). *Starks v. Perloff Bros.,* 760 F.2d 52, 55 (3d Cir. 1980) ("An overly restrictive reading of a complaint is inconsistent with the mandate that pleadings shall be so construed as to do substantial justice."); *see also Libby v. L. J. Corp.,* 247 F.2d 78, 82 (D.C. Cir. 1957) ("The form of the complaint suggests, somewhat ambiguously, that both damages for breach of a contract and an accounting for breach of fiduciary relationship are sought; perhaps these ambiguities should, for present purposes, be resolved by reading the complaint as praying for damages or an accounting in the alternative.  In all events, under Rule 8(f), we must read the complaint, however inartfully drawn, as one which, when and if supported, would entitle appellant to the relief warranted by the proof, rather than the relief formally claimed by the pleading. [While the entire story is not discernible from the meager record before us, it would appear to present what is essentially an appeal to the equity powers of the court.]") (Burger, J.) (footnote text included in brackets).

To be sure, Plaintiffs' alternative prayer for damages or equitable relief was proper. *See*, *e.g*., *Deutscher Tennis Bund v. ATP Tour, Inc*., Civil Action No. 07-178, 2008 WL 2520809, at *2 (D. Del. June 23, 2008) ("The plaintiffs dispute ATP Tour's claims, arguing that they seek money damages that have in fact occurred, and injunctive relief in the alternative.").  Moreover, because Plaintiffs alleged the necessity of the rescission of the First Exchange Offer, whether Plaintiffs had an adequate remedy at law could not be determined without discovery. *See*, *e.g*., *E. River Sav. Bank v. Sec'y of Housing & Urban Dev*., 702 F. Supp. 448, 455 (S.D.N.Y. 1988).  As far as Defendants' position that Plaintiffs did not state a claim for equitable rescission because "there has been no breach of contract, and the Company only acted unto the Bondholders in accord with the Prior

Indentures," [D.I. 19, at p. 37], Plaintiffs address above why their claims under the Trust Indenture Act and contract-based claims had merit.

### 5.      Plaintiffs Stated a Claim Against Harrah's Board

Finally, Defendants contend that "Plaintiffs' claim against the individual Harrah's directors is completely devoid of merit." [D.I. 19, at 37].   In support, Defendants take the position that: a) the board defendants were not "party to any of the relevant indentures; b) the indentures immunize the directors; c) the "limitations on suits" clause would require a pre-suit demand on the directors; and, d) "board members act for a corporation, and a corporation cannot interfere with a contract to which itself is a party." [D.I. 19, at pp. 37-40].

Defendants misapprehend the law.

Plaintiffs' claim against Harrah's Board was based on the allegation that they knowingly ratified and were the "but for" cause of the First Exchange Offer, and the First Exchange Offer tortiously interfered with Plaintiffs' indentures since the exchange offers breached the indentures, breached the covenant of good faith and fair dealing, violated the Trust Indenture Act, and entitled Plaintiffs to equitable rescission. [D.I. 15, ¶¶108-113].

It is black letter law that an individual can be personally liable for all torts which that individual committed, notwithstanding the person may have acted as an agent or under the direction of another.  3A Fletcher Cyc. Corp. §1135.  This rule applies to board members acting in their official capacities, including Harrah's Board.  *Id.*  Whether the corporation or the corporate officers themselves benefitted is immaterial as to whether the corporate officers are liable to third parties. *Id.*; *see T.V. Spano Bldg. Corp.* v. *Dep't of Natural Res. & Envtl. Control*, 628 A.2d 53, 61 (Del. 1993) (relying on Fletcher's treatise and stating, "We hold that corporate officers may be held personally liable in appropriate circumstances for actually making corporate decisions resulting in the improper disposition of hazardous waste under the Act."); *Bano v. Union Carbide Corp.*, 273

F.3d 120, 133 (2d Cir. 2001) ("Under New York law, a corporate officer who commits or participates in a tort, even if it is in the course of his duties on behalf of the corporation, may be held individually liable.").

Defendants neglect to acknowledge this doctrine.  For that reason, their contentions that liability cannot attach because the board defendants would have to be parties to the indentures or because "board members act for a corporation, and a corporation cannot interfere with a contract to which itself is a party," are unfounded.  Neither condition is necessary or material to the board defendants' liability to Harrah's bondholders under the doctrine.  *Cf. Ruckle v. Roto Am. Corp.*, 339 F.2d 24, 26 (2d Cir. 1964) ("[W]e hold that federal courts have jurisdiction over actions in which the complaint alleges that a corporation has been or may be defrauded into issuing or selling securities through the failure or refusal of some of its directors fully to disclose to the remaining directors material facts concerning the transactions or the financial condition of the corporation.").

Nor is there merit to Defendants' contention that Harrah's Board is somehow immunized because of the liability clause in the indenture .  The authority upon which Harrah's purports to rely expressed that liability clauses only apply to contract claims against directors.  *LaSalle Nat'l Bank v. Perelman*, 141 F. Supp. 2d 451, 462 (D. Del. 2001).  ("In sum, the court finds that the no recourse provisions of the Holdings, Parent and Marvel III indentures are similar in scope to the no recourse provisions limited to contract claims in *Bankers Trust*, *Small*, *Geyer* and *Mabon*.  Therefore, the court concludes that the no recourse provisions bar only contract claims."). Plaintiffs' claim against Harrah's Board is not a contract claim or for breach of the indentures themselves, but is instead a tort claim for which the liability limitation in the indentures have no applicability.  For that reason, moreover, the "limitations on suit" provision regarding a pre-suit demand  is immaterial — separate

and apart from Plaintiffs' explanation above that the provision does not apply and, alternatively, that extrinsic evidence would be necessary to determine its applicability.

## III.   CONCLUSION

Based on the foregoing, Plaintiffs respectfully ask this Court to find that: a) Plaintiffs' lawsuit was the presumptive cause of the Second Exchange Offer; b) the Second Exchange Offer granted tangible benefits to the class of bondholders on whose behalf Plaintiffs brought this suit, c) Plaintiffs are entitled to an award of attorneys' fees and reimbursement of expenses arising out of those benefits; and d) Plaintiffs are granted leave to conduct limited discovery to determine the amount of accredited investors which received cash and/or New Notes in the Second Exchange Offer.  Specifically, Plaintiffs respectfully ask this Court to award Plaintiffs attorneys' fees and expenses in the amount equal to 25% of the $2.77 million in benefit received by retail holders in the Second Exchange Offer, 25% of the portion attributable to bonds held by accredited investors involved in the $66 million dollar benefit rendered in the HBC cash tender component of the Second Exchange Offer, and 25% of the portion attributable to bonds held by accredited investors involved in the $347 million dollar benefit achieved *via* the note exchange component of the Second Exchange Offer, after the portion received by accredited investors is determined pursuant to the limited discovery Plaintiffs request.

July 24, 2009                                ROSENTHAL, MONHAIT & GODDESS, P.A.


                                             *s/ P. Bradford deLeeuw*
                                             Joseph A. Rosenthal (#234)
                                             jrosenthal@rmgglaw.com
                                             P. Bradford deLeeuw (#3569)
                                             bdeleeuw@rmgglaw.com
                                             919 N. Market Street, Suite 1401
                                             P. O. Box 1070
                                             Wilmington, DE  19899
                                              (302) 656-4433

                                             *Delaware Counsel for the Plaintiffs*

OF COUNSEL:

COUGHLIN STOIA GELLER RUDMAN
   & ROBBINS LLP
PAUL J. GELLER
JONATHAN M. STEIN
STUART A. DAVIDSON
CULLIN A. O'BRIEN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  (561) 750-3000

COUGHLIN STOIA GELLER RUDMAN
   & ROBBINS LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  (631) 367-7100

RICH WALDEN
WALDEN LAW FIRM, PLLC
8201 Cantrell, Suite 315
Little Rock, AR 72227
Telephone:  (501) 907-7000