# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| S. BLAKE MURCHISON and WILLIS SHAW, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | C.A. No. 09-20-SLR |
| HARRAH'S ENTERTAINMENT, INC., HARRAH'S OPERATING COMPANY, INC., CHARLES L. ATWOOD, JEFFREY BENJAMIN, DAVID BONDERMAN, ANTHONY CIVALE, JONATHAN COSLET, KELVIN DAVIS, JEANNE P. JACKSON, GARY W. LOVEMAN, KARL PETERSON, ERIC PRESS, MARC ROWAN, LYNN C. SWANN, and CHRISTOPHER J. WILLIAMS, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

OF COUNSEL:

LATHAM & WATKINS LLP

James E. Brandt
Joseph J. Frank
Charles J.G. Mazer
885 Third Avenue, Suite 1000
New York, New York 10022
(212) 906-1200 (office)
(212) 751-4864 (facsimile)


Dated: September 30, 2009

Gregory P. Williams (# 2168)
Thomas Beck (# 2086)
Kelly E. Farnan (# 4395)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700 (main)
(302) 651-7701 (main fax)

Attorneys for Defendants Harrah's Entertainment, Inc., Harrah's Operating Co., Inc., Charles L. Atwood, Jeffrey Benjamin, David Bonderman, Anthony Civale, Jonathan Coslet, Kelvin Davis, Jeanne P. Jackson, Gary W. Loveman, Karl Peterson, Eric Press, Marc Rowan, Lynn C. Swann, and Christopher J. Williams

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

PRELIMINARY STATEMENT .............................................................. 1

FACTUAL BACKGROUND ................................................................. 10

I.      THE FIRST EXCHANGE OFFER AND RESULTING LITIGATION ........................... 10

II.     THE SECOND EXCHANGE OFFER AND PLAINTIFFS' COUNSEL
        VOLUNTARILY DISMISS THE ACTION ...................................... 12

ARGUMENT ............................................................................. 15

I.      PLAINTIFFS' COUNSEL CANNOT SEEK FEES FROM HARRAH'S AND
        ITS STOCKHOLDERS BECAUSE OF A BENEFIT ALLEGEDLY
        CONFERRED ON BONDHOLDERS. ............................................ 15

        A.    The Corporate Benefit Doctrine Does Not Apply -- Plaintiffs' Counsel
              Conferred a Benefit, If At All, Only On a Small Group of Harrah's
              Bondholders Rather Than On the Company Or Its Stockholders. .......... 16
        B.    The Common Fund Doctrine Does Not Apply -- Plaintiffs' Counsel
              Cannot Seek a Fee Award From the Company Rather Than From the
              Consideration Paid To The Bondholders At Issue. ..................... 18

II.     THIS COURT SHOULD DENY PLAINTIFFS' COUNSEL AN AWARD OF
        FEES BECAUSE HARRAH'S SECOND EXCHANGE OFFER WAS CAUSED
        BY A CHANGE IN LAW, NOT BY PLAINTIFFS' DEFECTIVE LAWSUIT. ............. 19

III.    THIS COURT SHOULD DENY PLAINTIFFS' COUNSEL AN AWARD OF
        FEES BECAUSE THE UNDERLYING LITIGATION WAS UNSUPPORTED
        BY LAW. .............................................................. 21

        A.    Plaintiffs Lack Standing. ........................................... 21
              1.    Plaintiffs Failed to Comply With the Indentures No-Action
                    Provisions. ................................................... 21
              2.    Plaintiffs Lack Standing Under the Trust Indenture Act ........ 23
              3.    Plaintiffs Facially Lack Standing to Bring Claims On Behalf of
                    Eight of the Ten Classes of Bondholders ....................... 24
        B.    Plaintiffs' Claims Are Unsupported By Substantive Law ............... 25

i

| | 1. | The Prior Note Indentures Specifically Allow Both Exchange Offers ......................................................................................................... | 25 |
| | 2. | Plaintiffs' Implied Covenant Claims Cannot Depend on the Same Allegations as Their Contract Claims ..................................................... | 27 |
| IV. | | THIS COURT SHOULD DENY PLAINTIFFS' COUNSEL FEE REQUEST BECAUSE THE REQUEST IS UNREASONABLE ....................................................... | 28 |

CONCLUSION ........................................................................................................................... 30

RLF1-3441123-1

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Am.*,
No. 04-10014, 2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005).............................22

*Brady v. UBS Finance Services Inc.*,
538 F.3d 1319 (10th Cir. 2008) ................................................................23

*In re Cendant Corp. Prides Litig.*,
243 F.3d 722 (3d Cir. 2001)................................................................29, 30

*Cooperstock v. Pennwalt Corp.*,
820 F. Supp. 921 (E.D. Pa. 1993) ........................................................17, 20

*DB Structured Prods., Inc. v. Baltimore Am. Mortgage Corp.*,
No. 07-4109, 2009 WL 399746 (S.D.N.Y. Jan. 23, 2009) .................................28

*Deputy v. Taylor*
No. 02-183-SLR, 2003 WL 361216 (D. Del. Feb. 19, 2003) ............................30

*E.H.I. of Fla., Inc. v. Insurance Co. of N. Am.*,
652 F.2d 310 (3d Cir. 1981)......................................................................7

*Federated Strategic Income Fund v. Mechala Group Jamaica Ltd.*,
No. 99-10517, 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999)...........................23, 24

*Glenn v. Hayman*,
No. 07-172, 2007 WL 894213 (D.N.J. Mar. 21, 2007) ...................................24

*Gunter v. Ridgewood Energy Corp.*,
223 F.3d 190 (3d Cir. 2000)....................................................................29

*Howie v. Elite Info. Group, Inc.*,
No. Civ. A. 00-462-SLR, 2001 WL 753803 (D. Del. June 29, 2001) ...........6, 20

*In re Hechinger Investment Co. of Del.*,
274 B.R. 71 (D. Del. 2002)......................................................................17

*In re RAIT Finance Trust Sec. Litig.*,
No. 2:07-cv-03148, 2008 WL. 5378164 (E.D. Pa. Dec. 22, 2008) ....................24

*Inst. Juveniles v. Sec'y of Public Welfare*,
758 F.2d 897 (3d Cir. 1958)....................................................................20

RLF1-3441123-1

*JPMorgan Chase Bank, N.A. v. IDW Group, LLC,*
  No. 08-9116, 2009 WL 321222 (S.D.N.Y. Feb. 09, 2009)................................8, 28

*Joy Manufacturing Corp. v. Pullman-Peabody Co.,*
  729 F. Supp. 449 (W.D. Pa. 1989)...................................................17

*Kahan v. Rosenstiel,*
  424 F.2d 161 (3d Cir. 1970)..............................................20, 21, 25

*Lorenz v. CSX Corp.,*
  1 F.3d 1406 (3d Cir. 1993)..................................................9

*Mills v. Electric Automobile-Lite Co.,*
  396 U.S. 375 (1970)....................................................5, 15

*Peak Partners, LP v. Republic Bank,*
  191 Fed. Appx. 118 (3d Cir. 2006)...........................................22

*Prudential Insurance Co. of Am. v. BMC Indus., Inc.,*
  662 F. Supp. 436 (S.D.N.Y 1987) ...........................................28

*In re Rite Aid Corp. Sec. Litig.,*
  396 F.3d 294 (3d Cir. 2005)................................................29

*Rode v. Dellarciprete,*
  892 F.2d 1177 (3d Cir. 1990)...............................................28

*UPIC & Co. v. Kinder-Care Learning Ctrs., Inc.,*
  793 F. Supp. 448 (S.D.N.Y. 1992) .........................................23

*In re Warfarin Sodium Antitrust Litig.,*
  212 F.R.D. 231 (D. Del. 2002) .............................................29

## STATE CASES

*Alaska Elec. Pension Fund v. Brown,*
  941 A.2d 1011 (Del. Supr. 2007)..........................................16, 21

*Bank of N.Y. Mellon v. Realogy Corp.,*
  No. 4200, 2008 WL 5259732 (Del. Ch. Dec. 18, 2008)............................27

*Belanger v. Fab Industries, Inc.,*
  No. 054-N, 2004 WL 3030517 (Del. Ch. Dec. 29, 2004)...........................16

*In re Dunkin' Donuts S'holders Litig.,*
  No. 10825, 1990 WL 189120 (Del. Ch. Nov. 27, 1990) ........................16, 18

iv

*In re Infinity Broad. Corp. S'holder Litig,,*
    802 A.2d 285 (Del. Supr. 2002)..................................................................6, 19, 20

*In re Loral Space & Comm'ns Consol. Litig.,*
    Nos. 2808-VCS, 3022-VCS, 2008 WL 4293781 (Del. Ch. Sept. 19, 2008) ........................9

*Prod. Resources Group v. NCT Group, Inc.,*
    863 A.2d 772 (Del. Ch. 2004)..................................................................17

*United Vanguard Fund v. TakeCare, Inc.,*
    693 A.2d 1076 (Del. Supr. 1997)..................................................................17

## FEDERAL STATUTES

15 U.S.C. § 78(n) ..................................................................................................7

26 U.S.C. § 108(i) ..................................................................................................3

17 C.F.R. § 230.144A(a)(1) ..................................................................................2

Pub. L. 115-5, § 1231 (Feb. 17, 2009)..................................................................3, 13

## OTHER AUTHORITY

S.E.C. Release No. 33-6806, 1988 WL 1024389 (Oct. 25, 1988)....................................2

*Murchison v. GMAC LLC,* 09-1697 (D. Del. 2009) ..................................................4, 11

*Murchison v. Harrah's Ent. Inc.,* 09-00020-SLR (D. Del. 2009) ....................................4

*Murchison v. Station Casinos, Inc.,* 2:09-293 (D. Nev. 2009) ....................................4, 11

v

## PRELIMINARY STATEMENT

Plaintiffs' counsel seek an award of over $100 million in attorneys' fees based on a complaint with no legal basis and based on a bond exchange offer in which they had absolutely no involvement. This Court should deny plaintiffs' motion in its entirety.[1]

### The Exchange Offers

This case is about two different bond exchange offers[2] in which a large corporation, Harrah's,[3] essentially bought back a significant portion of its debt – debt which had been trading in the secondary market at a discount.

In its First Exchange Offer, Harrah's (along with every other company at the time) was limited by the U.S. tax laws to how much debt it could repurchase without incurring substantial tax – essentially, the more debt a company repurchased at a discount, the more Cancellation of Indebtedness ("COD") income that would be taxed in that same year. In the recent financial crisis, Harrah's and numerous other companies first launched limited debt buybacks – reducing their debt burden, but limiting the size of the offerings mindful of the adverse tax consequences that would occur the larger the debt buybacks became.[4]

---

[1] Given the legal infirmities of the underlying action, this Court has discretion to award defendants their fees in connection with this litigation.

[2] For purposes of this brief, Harrah's exchange offer that closed on December 24, 2008 will be referred to as the "First Exchange Offer," while Harrah's exchange offer that closed on April 15, 2009 will be referred to as the "Second Exchange Offer."

[3] Harrah's Operating Company, Inc. is the borrower of all the notes in question, and Harrah's Entertainment, Inc. is the guarantor of that indebtedness. Unless that distinction becomes relevant to a particular issue, this answering brief will refer to Harrah's Entertainment, Inc. and Harrah's Operating Company, Inc. collectively as "Harrah's."

[4] *See, e.g.,* Ex. A (Bree Fowler, "GMAC swings to profit on gain from debt exchange," Associated Press, Feb. 3, 2009 (discussing GMAC and ResCap 2008 debt exchanges)); Ex. B (Reuters, "Six Flags Announces Final Results of Debt Exchange Offer," June 12,

As part of its First Exchange Offer, Harrah's issued approximately $1.3 billion in new bonds in exchange for retiring close to $2.0 billion of the Company's $10 billion in total bond debt. Two factors dictated the size and structure of Harrah's First Exchange Offer.

First, given the adverse tax consequences, Harrah's calculated that it could reasonably retire only about 20% of its then outstanding indebtedness. Second, significantly more than 90% of Harrah's bonds were held by institutional investors. Given these facts, Harrah's decided to launch its debt buyback using a Section 144A offering authorized by the securities laws.[5]

Compared to a public tender offer, Section 144A authorizes an issuer to use a more simplified and cost-effective method of repurchasing its public debt – but only if that offering is limited to institutional investors known as Qualified Institutional Buyers ("QIBs").[6] 17 C.F.R. § 230.144A(a)(1); (d)(1). Part of the reasoning behind Section 144A is that QIBs presumably are less in need of the more full (and correspondingly more expensive and more time consuming) disclosures required for a public offering. *See* S.E.C. Release No. 33-6806, 1988 WL 1024389 (Oct. 25, 1988).

And that's what Harrah's did. Given that Section 144A offerings are commonly used and given that the bond indentures at issue do not require (*n.b.*, unlike some other indentures) that a purchase offer be made to all holders, Harrah's offered all QIBs an opportunity to sell their bonds at a substantial discount using the short form disclosure allowed by Section 144A and subject to the limited size of the offering dictated by the then existing tax laws.

---

2008.) References in the form of "Ex.__" refer to exhibits to the Declaration of Kelly E. Farnan, filed concurrently herewith.

[5] As a securities issuer, Harrah's made its offerings under Section 4(2) of the securities laws, which in turn incorporates the definition of QIB contained in Section 144A. For ease of use, we will refer to Harrah's offerings as Section 144A offerings.

[6] A related provision, Regulation S, allows the same type of offering to be made to a narrow class of foreign investors not implicated in this case.

2

Shortly thereafter, Congress and President Obama recognized that the tax laws were creating a substantial barrier to the process of de-leveraging through debt buybacks – and *they changed the law*. Under the new law, enacted as part of the national stimulus package, companies that create substantial COD income through debt buybacks need not have the cash on hand to pay the tax that accrues.[7] Instead, under the new law, companies are granted an extended period of years over which to pay the tax on COD income generated as part of the process of de-leveraging. Pub. L. 115-5, § 1231 (2009). As intended, the change in law set off a flurry of new debt buybacks.[8]

Harrah's Second Exchange Offer was one of those new debt buybacks. As part of its Second Exchange Offer, Harrah's issued approximately $3.4 billion in new bonds in exchange for retiring close to $6.2 billion of the Company's $8 billion in total bond debt (having already reduced bond debt by $2 billion as part of its First Exchange Offer). Given the new tax laws, Harrah's opened its offer to all comers – whether QIBs, accredited investors,[9] or retail holders.[10]

---

[7] American Recovery and Reinvestment Act of 2009 (the "Recovery Act"), Pub. L. 115-5, § 1231 (2009), *and see* 26 U.S.C. § 108(i).

[8] *See, e.g.*, Ex. C (Poornima Gupta, "Ford Launches Major Debt Restructuring," Reuters, Mar. 5, 2009); Ex. D (NXP Press Release, "NXP Announces Private Debt Exchange Offers," March 03, 2009); Ex. E (Press Release, "iStar Financial Announces Results and Expiration of Private Exchange Offers and Cash Tender Offer for Outstanding Debt Securities," PR Newswire, May 7, 2009).

[9] Accredited investors are investment professionals that are not sufficiently large or experienced enough to qualify as QIBs.

[10] Retail investors are individuals who buy bonds for their own account. Given the risks associated with unsecured high yield debt of the type at issue here, Harrah's – like almost all similarly situated companies – has vanishingly few retail holders of its debt.

3

## The Litigation

During the recent financial crisis, M&A activity (and the corresponding litigation it routinely generates) virtually ceased. During that same period, plaintiffs' counsel, Coughlin, Stoia, Geller, Rudman & Robbins LLP ("Coughlin Stoia"), began to bring a series of short-lived lawsuits all with essentially the same premise – that, notwithstanding the express terms of the indentures at issue, companies somehow owed a duty to their bondholders to extend the same buyback offers to all types of investors. *See, e.g., Murchison v. Station Casinos, Inc.*, 2:09- 293 (D. Nev. 2009); *Murchison v. Harrah's Ent. Inc.,* 09-20-SLR (D. Del. 2009); *Murchison v. GMAC LLC*, 09-169 (D. Del. 2009). Interestingly, Mr. Murchison – an individual retail investor from Arkansas represented by plaintiffs' former Arkansas co-counsel S. Gene Cauley[11] – has figured prominently in each.

Those cases have now fallen away. Coughlin Stoia, for example, recently was forced to dismiss a virtually identical case against Stations Casino and its debt exchange offer. *See Murchison v. Station Casinos, Inc.*, 2:09- 293 (D. Nev. 2009).

## The Current Fee Request

Faced with a dispositive motion to dismiss in this case, Coughlin Stoia chose to voluntarily dismiss this litigation as well. Yet, now plaintiffs' counsel unabashedly seeks a windfall fee award – arguing that their frivolous litigation (rather than the hundreds of millions of dollars in tax benefit caused by the recent change in law) somehow caused Harrah's Second Exchange Offer. This Court, however, should decline to award plaintiffs' counsel any fees for three reasons.

---

[11]  This Court subsequently revoked Mr. Cauley's *pro hac vice* admission after Mr. Cauley pled guilty to criminal activity.

4

First, plaintiffs' counsel are absolutely barred as a matter of law from seeking a fee award from Harrah's. Plaintiffs' counsel asks this Court to have Harrah's – and by extension Harrah's stockholders – pay an award of fees for a benefit allegedly conferred on a small class of bondholders. (D.I. 28 at 2, 13.) Yet, Harrah's and its stockholders received absolutely no benefit from the reversal of the allegedly wrongful behavior – allowing non-QIBs to participate in Harrah's Second Exchange Offer. If anyone benefited, it would be the class of bondholders that participated.

Yet, plaintiffs' counsel sued only Harrah's[12] and – after voluntarily dismissing not one but two meritless complaints – plaintiffs' counsel are now left with no one else but the Company from whom to seek fees. In support of their fee request, plaintiffs' counsel struggle to invoke two conflicting exceptions to the general rule that each party should bear its own fees in litigation.

On the one hand, plaintiffs' counsel seek to invoke the "corporate benefit doctrine" – in which plaintiffs' counsel may recover a fee award from the corporate defendant involved because the company and its equity holders have benefited in some way from the litigation (*e.g.*, by increased disclosure as part of the stockholders' decision making process in a corporate merger). (D.I. 28 at 2.) On the other hand, plaintiffs' counsel seek to invoke the "common fund doctrine" – in which plaintiffs' counsel may recover a fee award *from* a common monetary fund created as a result of the litigation. (D.I. 28 at 13.) Yet, neither doctrine is meant "to saddle the unsuccessful party with the expenses but to impose them on the class that has benefited from them." *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 396-7 (1970). Instead, both doctrines seek

---

[12] Plaintiffs' counsel also sued each member of Harrah's board of directors without a single allegation of individual misconduct – evidently seeking to hold the board individually

to identify the benefited parties and – assuming all other requirements are met – to have those benefited parties pay any fee award. Here, plaintiffs' counsel make no such attempt, instead conflating the two doctrines in an attempt to distract the Court from the fact that they simply are not entitled to a fee award – much less a few award directly from Harrah's and its stockholders

Second, Harrah's Second Exchange Offer was caused, not by plaintiff's baseless lawsuit, but by a fundamental change in tax law. That change in tax law was enacted after Harrah's First Exchange Offer as part of the national stimulus package and was expressly intended to increase the scope of debt buyback offers. And that's exactly what happened with Harrah's.

Harrah's had significant tax reasons for limiting its First Exchange Offer and for broadening its Second Exchange Offer. Those reasons have absolutely nothing to do with the facially defective complaints filed by plaintiffs' counsel on behalf of two lone retail investors. Although a fee award can at times be appropriate if a lawyer proximately caused a benefit to a represented class,[13] where (as here) evidence undermines "a causal relationship between the benefit and a timely filed suit," courts will summarily deny a fee award. *See, e.g., In re Infinity Broad. Corp. S'holder Litig.*, 802 A.2d 285, 290 (Del. 2002) ("the mere pendency of litigation alone does not establish the causal connection between counsel's efforts and changes … that benefit the … class."); *Howie v. Elite Info. Group, Inc.*, No. 00-462, 2001 WL 753803, at *3 (D.

---

and personally liable for what, at most, amounts to the Company's breach of the bond indenture contracts.

[13] Here, there is no certified class, and no way for class members to be notified or to object to any fee application. Significantly, plaintiffs' counsel has not requested or explained how this Court should notify potential class members and give them an opportunity to object or support the application for attorneys' fees. Any lack of objections to the present motion does not support the reasonableness of the fee request. If anything, this factor should weigh against the fee application as Coughlin Stoia is seeking a vast sum of money that would diminish the very cash flow that otherwise would be used to meet principal and interest payments due to the very bondholders they claim to represent.

6

Del. June 29, 2001) (denying fees on a finding that a merger was terminated because "of the FTC's opposition to the Merger, and not because of plaintiff's litigation.").

Third, the litigation filed by plaintiffs' counsel was defective as a matter of law. For example, in its original complaint (subsequently dismissed after Harrah's moved to dismiss), Coughlin Stoia tried to avoid the terms of the bond indentures and support its claim of federal jurisdiction by alleging violations of Section 14(d) of the Williams Act – the "All Holders Best Price Rule." 15 U.S.C. § 78(n). Yet, no one disputes that the Williams Act applies only to public stock offerings and does not apply to bonds at all. *See, e.g., E.H.I. of Fla., Inc. v. Ins. Co. of N. Am.*, 652 F.2d 310, 313 (3d Cir. 1981) (holding that Section 14(d) of the Williams Act simply does not apply to bonds, unlike stocks that must be registered under Section 12 of the 1934 Act). After Harrah's explained the Williams Act to plaintiffs' counsel in Harrah's first motion to dismiss, that claim vanished from plaintiffs' Amended Complaint – never to be heard from again.

Coughlin Stoia's amended attempt to avoid Delaware Chancery Court by alleging violations of the federal Trust Indenture Act ("TIA") is similarly unsupported. On its face, the TIA applies only if bondholders have failed to receive promised principle or interest, or had the terms of their indentures unilaterally altered – something that unquestionably did not happen here. By the express terms of the indentures and exchange offers, non-tendering bondholders have the exact same right to principle and interest as before. Similarly, the rights under the relevant indentures are not amended in any way and indeed are unchanged by the mere fact that some bondholders chose to sell their bonds back at a discount.

Coughlin Stoia's litigation also was barred by the No-Action provisions in the indentures themselves (setting out express contractually-agreed conditions that must be met before any

bondholder may bring suit for breach) – none of which plaintiffs' counsel even pretended to meet. (D.I. 19, *passim*.) Further, Messrs. Murchison and Shaw – the clients that Coughlin Stoia inherited when Mr. Cauley went to jail – lack standing to sue on behalf of eight of the ten classes of Harrah's bondholders that they purport to represent. Indeed, the ten different classes of Harrah's bonds at issue are governed by a similar number of separate indentures – each of which has different terms and creates different rights. Messrs. Murchison and Shaw in turn were parties to only two of those indentures – but then incredibly purported to sure for breach of contracts to which they were not even parties or third party beneficiaries.

Plaintiffs' claim for breach of the relevant indentures (*n.b.*, the only claim that plaintiffs even possibly could allege in the context of a debt buyback) was substantively defective throughout. Indeed, although Coughlin Stoia and Mr. Cauley pointed to express terms in the various indentures, they could not even articulate how those provisions applied let alone were breached. All plaintiffs' counsel were left with was a catchall allegation that debt buybacks (*n.b.*, presumably all debt buybacks, all across the country) somehow violate the implied covenant of good faith and fair dealing. Yet, under New York law, the implied covenant of good faith and fair dealing does not impose some general subjective requirement of fairness from the plaintiffs' point of view. *JPMorgan Chase Bank, N.A. v. IDW Group, LLC*, No. 08-9116, 2009 WL 321222, at *7 (S.D.N.Y. Feb. 9, 2009) (dismissing claims for breach of the implied covenant of good faith and fair dealing on the grounds that (as here) those claims were based on same predicate facts as contract claims and would create obligations that were not part of the written contract). Instead, violations of the covenant must be tied to a party's attempt to subvert or avoid an express term of the contract in a manner inconsistent with the parties' clear intent. *Id.*

8

Here, there is no express term allegedly subverted and no allegation whatsoever about what the parties intended in their bond indentures.

Indeed, it is black letter law that the relationship between a company and its bondholders is adverse, that indentures are interpreted narrowly, and that any action that is not expressly prohibited is permitted. *See, e.g., Lorenz v. CSX Corp.,* 1 F.3d 1406, 1417 (3d Cir. 1993) (holding that "a corporation is under no duty to act for the benefit of its debentureholders, or to refrain from action which dilutes their interest, except as provided in the indenture"); *In re Loral Space & Comm'ns Consol. Litig.,* Nos. 2808-VCS, 3022-VCS, 2008 WL 4293781, at *35 (Del. Ch. Sept. 19, 2008) ("Indentures are to be read strictly and to the extent they do not expressly restrict the rights of the issuer, the issuer is left with the freedom to act, subject only to the [] positive law.").

Finally, although Coughlin Stoia's first complaint sought to bring claims only on behalf of a small group of retail investors who were "excluded" from Harrah's First Exchange Offer because of the federal securities law requirements of Section 144A, Coughlin Stoia's Amended Complaint (filed before Harrah's Second Exchange Offer) inexplicably switched gears – claiming to represent *everyone* (*n.b.,* by their own admission Messrs. Murchison and Shaw are only retail investors, not QIBs or accredited investors) and to seek recovery because Harrah's First Exchange Offer offered "*unfair* exchange ratios." (D.I. 15 at ¶ 2.) Yet, the bond indentures at issue do not purport to promise compliance with plaintiffs' counsel's subjective concept of fairness – they contain express terms to which the parties agreed and with which Harrah's has complied.

After Harrah's filed a second motion to dismiss, plaintiffs' counsel sought several extensions, and then voluntarily and unilaterally dismissed their Amended Complaint. In the six

9

months that this case was pending, Coughlin Stoia filed exactly two documents, both of which were facially unsupported by law: their initial and amended complaints. No discovery was taken. Plaintiffs' counsel filed no substantive briefing (or any other substantive documents, for that matter) prior to seeking a $100 million award of attorneys' fees.

What happened here is clear. Both of Harrah's exchange offers were perfectly legal and were motivated by sound business and tax reasons. Coughlin Stoia, for its part tried (and failed) to exploit a market-wide phenomenon through spurious litigation. Having had no success on the merits of any of their cases, Coughlin Stoia is now attempting to get this Court to believe that a $6 billion dollar Second Exchange Offer – which changed the fundamental economics of a multi-billion dollar company – was caused by their two facially deficient complaints. Nothing could be further from the truth.

## FACTUAL BACKGROUND

### I. THE FIRST EXCHANGE OFFER AND RESULTING LITIGATION[14]

On December 24, 2008, Harrah's closed the First Exchange Offer, which converted over $2 billion in ten different classes of existing notes ("Prior Debt")[15] into approximately $1 billion in new notes and cash. (D.I. 19 at 9-10.) The Exchange Offer was open to all investors who qualified as Qualified Institutional Buyers ("QIBs") under Rule 144A of the Securities Act or as non-U.S. persons under Regulation S. *Id.* at 10. This transaction, made in accord with the

---

[14] For a more full discussion of the First Exchange Offer, please see Defendants' motions to dismiss the Complaint and the Amended Complaint.

[15] Those notes were: (1) 7 7/8% Senior Subordinated Notes due 2010; (2) 8 1/8% Senior Subordinated Notes due 2011, (collectively the "Senior Subordinated Notes"); (3) 5.50% Senior Notes due 2010; (4) 8.00% Series A and B Senior Notes due 2011; (5) 5.375% Senior Notes due 2013; (6) 5.625% Senior Notes due 2015; (7) 6.5% Senior Notes due 2016; (8) 5.75% Senior Notes due 2017, (collectively the "Senior Notes"); (9) 10.75%

requirements of the indentures that governed the Prior Debt, allowed Harrah's to improve its debt position significantly, and was similar in structure to a number of debt exchange offers commenced toward the end of 2008, when many companies had outstanding bonds trading far below their face value. (*Id.*; *see also* Keath Decl. (D.I. 29) ¶¶ 3-4.)

On January 9, 2009, Coughlin Stoia and Mr. Cauley filed their Complaint against Harrah's on behalf of S. Blake Murchison and Willis Shaw, both allegedly residents of the state of Arkansas. (D.I. 1.) The Complaint alleged that the First Exchange Offer unfairly excluded non-QIB bond holders, violated the federal Trust Indenture Act ("TIA") and Williams Act, and was in breach of the terms of the Prior Debt indentures. (*Id.* ¶¶ 68-93.) The Complaint also alleged individual liability against Harrah's Board of Directors. (*Id.* ¶¶ 94-98.) As noted above, this was only one of many complaints filed by Coughlin Stoia following the spate of debt restructurings late last year. *See, e.g., Murchison v. Station Casinos, Inc.*, 2:09- 293 (D. Nev. 2009); *Murchison v. GMAC LLC*, 09-1697 (D. Del. 2009).[16]

Harrah's promptly moved to dismiss the Complaint in its entirety under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), (D.I. 11), on the grounds that the Complaint failed to allege jurisdiction – diversity jurisdiction was not pled on the face of the Complaint, and both the TIA and Williams Act claims were inapplicable to a debt restructuring where no allegation could be made that Harrah's had ever failed to honor its obligations to existing debt holders. (D.I. 13 10-15.) Harrah's also argued that the named plaintiffs – who held only two of the ten classes of bonds at issue – had no standing to bring claims for alleged breach of the indentures under which they

---

Senior Notes due 2016; and (10) 10.75%/11.5% Optional PIK Interest Senior Notes due 2018, (collectively the "Toggle Notes").

[16]   None of Coughlin Stoia's complaints has survived a motion to dismiss. On May 5, 2009, Murchison filed a notice of voluntary dismissal in *Murchison v. Station Casinos, Inc.*,

held no bonds, (*id.* at 17-19), and, in any event, that the terms of the indentures associated with each of the ten classes of bonds clearly allowed for the Exchange Offer. (*Id.* at 20-26.)

Less than two weeks after Harrah's filed its motion to dismiss, Coughlin Stoia interposed a First Amended Class Action Complaint ("Amended Complaint"). (D.I. 15.) This time, the pleading purported to state claims on behalf of *every* Harrah's bondholder, regardless of whether they were or were not eligible for the First Exchange Offer. (D.I. 15 at ¶ 5.) The Amended Complaint alleged that QIBs who willingly participated nevertheless "tender[ed] their bonds [] at an *unfair* exchange ratio." (*Id.* at ¶ 4.) (emphasis supplied). While still claiming entitlement to relief under the TIA (even though every Harrah's bondholder still had the unimpaired right to payments of principal or interest payable on the dates provided for in their indentures), the Amended Complaint dropped the Williams Act claim. (*See* D.I. 13 at 10.)

## II.  THE SECOND EXCHANGE OFFER AND PLAINTIFFS' COUNSEL VOLUNTARILY DISMISS THIS ACTION

In February 2009, as part of the larger omnibus stimulus package, Congress changed the tax laws on cancellation of indebtedness income, effectively increasing the amount of debt that Harrah's could purchase. Prior to the change in the law, amounts realized by discharge of indebtedness (through debt exchanges or otherwise) were generally chargeable as gross income for the taxable year in which the discharge occurred. *See* H. Rpt. 111-16, pp. 561-568 (Feb. 12, 2009) (official Conference Committee explanation of the debt-relief provisions of the stimulus package). The stimulus package added a new section to the tax code, which provides that cancellation of indebtedness income can be included in gross income ratably over the five-year period beginning with the fifth taxable year following the taxable year in which the reacquisition

---

2:09-cv-293 (D. Nev. 2009); after significant delay, dismissal briefing has been filed in *Murchison v. GMAC LLC*, 09-1697 (D. Del. 2009).

12

occurred. Pub. L. 115-5, § 1231 (Feb. 17, 2009). This time-limited beneficial tax treatment was available for indebtedness cancelled only through January 1, 2011. *Id.*

As a direct result of this change in law, and to "further reduce the principal amount and extend the average maturity of [their] debt," given the depressed market for Harrah's bonds, (Keath Decl. (D.I. 29) ¶ 9), Harrah's commenced another exchange offer ("Second Exchange Offer") on March 5, 2009. (Keath Decl. (D.I. 29) ¶ 9; *see also* D.I. 19., at Ex. N (Harrah's Press Release, dated March 4, 2009); Ex. F (Harrah's Form 10-Q, for the quarter ending March 31, 2009), at 11.)) The Second Exchange Offer was broader than the first, and was comprised of three essential components. First, eligible holders (which included QIBs, non-U.S. persons, and accredited investors under Rule 501(a) of Regulation D of the Securities Act) could exchange their Prior Debt for bonds that consisted of some of the New Debt that was offered in the First Exchange Offer, which held maturities at least as far in the future as the Prior Debt they replaced, or cash. (D.I. 19 at 32.) Second, holders of the New Debt (acquired either in the First or Second Exchange Offer) could exchange their notes for cash ("Second Lien Tender Offer"). (D.I. 19 at Ex. N (Harrah's Financial Press Release Mar. 4, 2009).) Third, holders of Prior Debt (like Plaintiffs) who were neither QIBs nor accredited investors could exchange their Prior Bonds for cash (the "Retail Tender Offer"). *Id.*

The Second Exchange Offer was very popular with bondholders. (Keath Decl. (D.I. 29) ¶ 10 ("The market welcomed news of the Second Exchange Offer.").) Harrah's had initially sought to cap the aggregate principal amount of Prior Debt exchanged at $2.8 billion; however, given the intense interest, Harrah's lifted the cap. The offer resulted in the exchange of over $5

billion in aggregate principal amount of Prior Bonds for $3.4 billion in New Bonds.[17] (D.I. 19 at 14-15; *see also* Ex. G (Harrah's Press Release, April 9, 2009).)

On April 29, 2009, Harrah's filed a new motion to dismiss the Amended Complaint, (D.I. 19), on the grounds that once again, plaintiffs' counsel failed to allege subject matter jurisdiction, presented no federal question under the Trust Indenture Act, and alleged no cognizable substantive claim for breach of contract. (*See* D.I. 19.) Further, because the Retail Tender Offer component of the Second Exchange Offer extinguished any claims plaintiffs may have had under their theory of "exclusion" (since every single holder of Harrah's debt was eligible to participate in the Second Exchange Offer), the Amended Complaint was rendered moot. (D.I. 19 at 24-25.) Plaintiffs' counsel then voluntarily dismissed their complaint by stipulation, which was approved by the Court. (D.I. 22.)

---

[17]    In addition, Harrah's paid out $97 million for Prior Bonds in the HBC Tender Offer and $4.8 million for Prior Bonds in the Retail Cash Tender Offer. (*Id.*)

# ARGUMENT

## I. PLAINTIFFS' COUNSEL CANNOT SEEK FEES FROM HARRAH'S AND ITS STOCKHOLDERS BECAUSE OF A BENEFIT ALLEGEDLY CONFERRED ON BONDHOLDERS.

Plaintiffs' counsel are barred as a matter of law from seeking an award of fees from Harrah's. Plaintiffs' counsel seek to have Harrah's – and by extension Harrah's stockholders – pay an award of fees for a benefit allegedly conferred a small class of bondholders. (D.I. 28 at 2, 13.) Yet, the Company and its stockholders received absolutely no benefit from the correction of the allegedly wrongful behavior – allowing non-QIBs to participate in Harrah's Second Exchange Offer. If anyone benefited, it would be the class of bondholders that participated.

Yet, plaintiffs' counsel sued only the Company and – after voluntarily dismissing not one but two meritless complaints – plaintiffs' counsel are now left with no one else but the Company from whom to seek fees. In support of their fee request, plaintiffs' counsel struggle to invoke two conflicting exceptions to the general rule that each party should bear its own fees in litigation. On the one hand, plaintiffs' counsel invoke the "corporate benefit doctrine" – in which plaintiffs' counsel may recover a fee award from the company because the company and its equity holders have benefited in some way from the litigation (*e.g.*, by increased disclosure as part of the stockholders' decision making process in a corporate merger). (D.I. 28 at 2.) On the other hand, plaintiffs' counsel invoke the "common fund doctrine" – in which plaintiffs' counsel may recover a fee award *from* a common monetary fund created as a result of the litigation. (*Id.* at 13.) Yet, neither doctrine is meant "to saddle the unsuccessful party with the expenses but to impose them on the class that has benefited from them." *Mills*, 396 U.S. at 396-7. Instead, both doctrines seek to identify the benefited parties and – assuming all other requirements are met – to have those benefited parties pay any fee award. Here, plaintiffs' counsel make no such attempt, instead conflating the two doctrines in an attempt to distract the Court from the fact that they

15

simply are not entitled to a fee award – much less a few award directly from Harrah's and its stockholders.[18]

As a preliminary matter, courts routinely have held that a fee request cannot rely (as plaintiffs' counsel do here) on both the corporate benefit and common fund doctrines – it's one or the other. As the Delaware Chancery Court held in *In re Dunkin' Donuts S'holders Litig.*, a fee request by plaintiffs' counsel necessarily falls "under either the common fund or the corporate benefit doctrine, **not both**." 1990 WL 189120, *at* *7 (Del. Ch. Nov. 27, 1990) (emphasis supplied). Counsel seeking fees may not (as here) invoke both doctrines and then have the court engage in a "pick a doctrine" exercise. *Id.* In this case, plaintiffs' counsel conflate the two doctrines at issue for one simple reason – they qualify under neither.

### A. The Corporate Benefit Doctrine Does Not Apply -- Plaintiffs' Counsel Conferred a Benefit, If At All, Only On a Small Group of Harrah's Bondholders Rather Than On the Company Or Its Stockholders.

With respect to the corporate benefit doctrine, neither Harrah's nor its stockholders have even arguably benefited from the actions of plaintiffs' counsel. Yet, under the corporate benefit doctrine, only "a litigant who confers a common monetary benefit upon an ascertainable *stockholder class* is entitled to an award of counsel fees." *Alaska Elec. Pension Fund v. Brown*, 941 A.2d 1011, 1015 (Del. Supr. 2007) (emphasis supplied); *see also Belanger v. Fab Indus., Inc.*, No. 054-N, 2004 WL 3030517, at *1 (Del. Ch. Dec. 29, 2004) (corporate benefit doctrine

---

[18] Even if the corporate benefit or common fund doctrines applied (which they most certainly do not), plaintiffs' counsel would still have to prove that: (a) the suit was meritorious; (b) the action producing the benefit was taken by defendants before a judicial resolution; and (c) the benefit was caused by the lawsuit. *See Alaska Elec. Pension Fund v. Brown*, 941 A.2d 1011, 1015 (Del. Supr. 2007); *In re Dunkin' Donuts S'holders Litig.*, 1990 WL 189120, at *7. As more fully discussed in Sections III and IV *infra*: (1) this litigation lacked merit throughout; and (2) the Second Exchange Offer was caused by a change in the tax laws and not by any efforts of plaintiffs' counsel.

applies only to "a litigant who confers a common monetary benefit upon an ascertainable stockholder class"). **Under the corporate benefit doctrine, because the benefit created necessarily accrues to the shareholders of the company, it is therefore the company that pays for the legal fees.** *See United Vanguard Fund Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. Supr. 1997).[19]

Here, the alleged benefit is limited by plaintiffs' own admission to a small class of bondholders – non-QIB bondholders who participated in Harrah's Second Exchange Offer. (D.I. 28 at 10 (claiming that the Second Exchange Offer "resulted in [] distinct, tangible benefits to retail and accredited investors.").) According to plaintiffs' counsel, it is that class of bondholders – and that class of bondholders alone – that benefited from this litigation. Although plaintiffs' counsel may argue in reply that Harrah's stockholders benefited from the decreased leverage resulting from the Second Exchange Offer and therefore should pay an award of fees from that benefit, such an argument would be misplaced for two reasons. First, plaintiffs' counsel do not claim that they caused the Second Exchange Offer – only that they caused the Second Exchange Offer to be open to non-QIBs. Second, it is undisputed that Harrah's sized its First Exchange Offer to be as large as possible while avoiding adverse tax consequences and it is

---

[19]     Plaintiffs' counsel fail to identify a single case in which attorneys' fees were paid by a company or its shareholders for a benefit to bondholders. The cases cited by plaintiffs' counsel uniformly deal with benefits to ***shareholders***, not third-party bondholders with no equity ownership in the company. *See, e.g., Joy Mfg. Corp. v. Pullman-Peabody Co.*, 729 F. Supp. 449, 460 (W.D. Pa. 1989); *Cooperstock v. Pennwalt Corp.*, 820 F.Supp. 921, 924 (E.D. Pa. 1993). As is discussed more fully in Harrah's motions to dismiss, the relationship between a corporation and its bondholders is adverse and one of contract, not one of fiduciary or ownership. *In re Hechinger Inv. Co. of Del.*, 274 B.R. 71, 89 (D. Del. 2002) (holding that bondholders have only contractual rights in the ordinary course); *Prod. Res. Group v. NCT Group, Inc.*, 863 A.2d 772, 787 (Del. Ch. 2004) (holding that bondholders are not owed any fiduciary duties).

17

similarly undisputed that Harrah's did exactly the same calculation when the tax laws changed to allow for larger debt buybacks. Put another way, the amount of debt reduction resulting from Harrah's Second Exchange Offer would have been exactly the same whether or not non-QIBs participated – if non-QIBs didn't participate, more debt just would have been tendered by QIBs. Accordingly, even under such an attenuated theory of benefit, neither Harrah's nor its stockholders would have benefited from any action taken by plaintiffs' counsel and plaintiffs' counsel cannot now seek fees under the corporate benefit doctrine.

**B.  The Common Fund Doctrine Does Not Apply -- Plaintiffs' Counsel Cannot Seek a Fee Award From the Company Rather Than From the Consideration Paid To The Bondholders At Issue.**

With respect to the common fund doctrine, plaintiffs' counsel fail to seek a fee award from the very fund of economic benefit they allegedly created for the class of previously excluded bondholders. Plaintiffs' counsel allow that alleged benefit to go completely untaxed, and instead, citing the common fund doctrine, try to force Harrah's and its stockholders to pay their fees. (D.I. 28 at 13)

Yet, the common fund doctrine applies only where plaintiffs' counsel "has caused the creation of a fund for the common benefit of an ascertainable class." *In re Dunkin' Donuts,* 1990 WL 189120, at *7. In contrast to the corporate benefit doctrine, any benefit need not accrue to stockholders or the Company, because the fund itself pays the fee out of the benefit conferred. Significantly, it is black letter law that any fees must be paid out of the *fund* itself – a successful plaintiff attorney's "fees and expenses" must "be paid from the fund or property which his efforts have created." *Id.*

Here, plaintiffs' counsel have not sought a fee award out of the consideration the bondholders received – presumably because the real class of bondholders (as opposed to merely Messrs. Murchison and Shaw) would object, arguing that plaintiffs' counsel did not have

18

anything to do with the benefit they received and they as bondholders should not receive less because of the this meritless litigation. Given that plaintiffs' counsel haven't even pretended to seek a fee award from a common fund of benefit created for the bondholders at issue, plaintiffs' counsel cannot now seek fees under the common fund doctrine.

## II. THIS COURT SHOULD DENY PLAINTIFFS' COUNSEL AN AWARD OF FEES BECAUSE HARRAH'S SECOND EXCHANGE OFFER WAS CAUSED BY A CHANGE IN LAW, NOT BY PLAINTIFFS' DEFECTIVE LAWSUIT.

Plaintiffs' counsel cannot establish that the Second Exchange Offer resulted in any way from this litigation. It is undisputed that a fundamental change in tax law occurred between Harrah's First and Second Exchange Offers – and it is further undisputed that the change in law at issue made it possible for Harrah's to increase the scope of their Second Offer without adverse tax consequences. It is that change in law that caused Harrah's Second Exchange Offer – not plaintiffs' fundamentally baseless lawsuit.

In support of their fee request, plaintiffs' counsel rely on a causation presumption that applies only when there is a complete lack of any "evidence that the litigation did *not* result directly in a cognizable benefit to the class." *In re Infinity Broad. Corp.*, 802 A.2d at 290. In other words, courts apply a "presumption that there is a causal relationship between the benefit and a timely filed suit" only if there is no evidence to the contrary. *Id.*

Here, there is ample evidence that Harrah's Second Exchange Offer was caused by the national Stimulus Act's fundamental change in tax law (*n.b.*, a change specifically intended to promote larger debt buybacks) rather than plaintiffs' lawsuit. Harrah's conducted the Second Exchange Offer for reasons independent of this litigation, namely to (1) reacquire its indebtedness at significantly discounted prices, reduce its overall debt burden, and increase liquidity; (2) extend the average maturity date of the notes coming due; and (3) benefit from a

19

change in the taxation of COD income.[20]  Indeed, the stated purpose of Harrah's Second

Exchange Offer was to reduce the outstanding amount of the Company's debt and to extend the

average maturity of its indebtedness.[21]  Plaintiffs' counsel's expert admits that the Second

Exchange Offer was launched to serve those ends at a time when Harrah's bonds were trading at

a significant discount. (D.I. 29 ¶¶ 7,9.)  In short, the Second Exchange Offer demonstrably had

nothing to do with this lawsuit.  *See, e.g.*, *In re Infinity Broad. Corp.*, 802 A.2d at 293 ("the mere

pendency of litigation alone does not establish the causal connection between counsel's efforts

and changes … that benefit the … class."); *Howie*, 2001 WL 753803, at *3 (finding that the

merger was terminated because "of the FTC's opposition to the Merger, and not because of

plaintiff's litigation.").  Plaintiffs' counsel cannot establish the requisite causal connection

between their lawsuit and the Second Exchange Offer, because there is simply no evidence that

the suit "constituted a material contributing factor in bringing about the events that resulted in

the obtaining of the desire relief." *Inst. Juveniles v. Sec'y of Public Welfare*, 758 F.2d 897, 916

(3d Cir. 1985).

Further, even if there were no evidence that another cause (*i.e.*, the fundamental change

in tax law) resulted in the alleged benefit, the presumption simply does not apply unless and until

the plaintiff has satisfied the other two elements of the corporate benefit doctrine, that: (1) the

action was meritorious at the time of filing;[22] and (2) a substantial benefit was conferred upon an

ascertainable class. *Cooperstock.*, 820 F. Supp. at 923 (citing *Kahan v. Rosenstiel*, 424 F.2d 161

(3d Cir. 1970)).  Here, plaintiffs' counsel have failed to satisfy either element.

---

[20]  Ex. F , Harrah's Form 10-K for the quarter ending March 31, 2009, at 11.

[21]  Ex. H, *Harrah's Entertainment Announces Private Exchange and Tender Offers for Harrah's Operating Company Debt Securities*, March 4, 2009 Press Release.

20

## III.    THIS COURT SHOULD DENY PLAINTIFFS' COUNSEL AN AWARD OF FEES BECAUSE THE UNDERLYING LITIGATION WAS UNSUPPORTED BY LAW.

Even if plaintiffs' counsel otherwise benefited an identifiable class (which they did not), the underlying litigation still must have been meritorious in order for fees to be awarded. *Alaska*, 941 A.2d at 1015. This case has never been meritorious. From the beginning, Plaintiffs have had no standing to sue, and have alleged no substantive basis for relief.

### A.    Plaintiffs Lack Standing

As a threshold matter, plaintiffs are not entitled to attorneys' fees in this case, because the plaintiffs never had standing to press their substantive claims.

#### 1.    Plaintiffs Failed to Comply With the Indentures No-Action Provisions

Plaintiffs' counsel never complied with the No-Action provisions (which they style as a "pre-suit demand") in their indentures, which require "(a) written notice [to be] provided to the Trustee of a continuing Event of Default, (b) holders of not less than 25% of the principal amount of the outstanding notes make a written request that the Trustee sue; (c) the holders have made reasonable efforts to indemnify the Trustee's litigation expenses, and (d) the Trustee has failed to institute proceedings within 60 days of receiving notice." (D.I. 13 at 16-17, D.I. 19 at 19-20.)[23] Failure to comply with these provisions invalidates the suit. *Id.*

In an attempt to get around this failure, plaintiffs' counsel have ginned-up a nonsensical "exception" to the No-Action provisions based on the following indenture language:

> [I]t being understood and intended that no one or more of such
> Holders shall have any right in any manner whatever by virtue of,
> or by availing of, any provision of this Indenture to affect, disturb
> or prejudice the rights of any other of such Holders, or to obtain or

---

[22]    "[C]ourts have said suits were 'meritorious' if they could have survived a motion to dismiss." *Kahan*, 424 F.2d at 167.

[23]    The ten indentures have slightly different no-action provisions; nevertheless, Plaintiffs have complied with none of them. (D.I. 28 at 23-25; D.I. 13 at 16-17; D.I. 19 at 19-20.)

> to seek to obtain priority or preference over any other of such holders or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all such Holders.

(D.I. 28 at 23.) This changes nothing.

First, neither plaintiffs nor any holders have had their rights "affect[ed], disturb[ed], or prejudice[ed]," since each and every Harrah's bond holder was entitled to the same interest and principal payments as they were prior to the exchange offers. (D.I. 19 at 4.) Second, to the extent this passage applies, rather than constituting an exception to the limitation on suits provision, this passage underscores its application. It says that no Holder "shall enforce any right under this Indenture *except in the manner herein provided*" – in other words, in compliance with the immediately-preceding No-Action clauses. There is simply no way to read this provision as providing any exception to the No-Action requirements of the indentures. Further, no "extrinsic evidence" is required to understand the plain language of the No-Action requirement; this Court is perfectly able to read this language to come to a conclusion as to its meaning. *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Am.*, 2005 WL 1950116, at *4 (S.D.N.Y. Aug. 12, 2005) ("The Court interprets bond indentures pursuant to contract law.").

The argument of plaintiffs' counsel that, somehow, the Second Exchange Offer rendered moot their need to comply with the No-Action clauses in their indentures, (D.I. 28 at 24), is similarly non-sensical; the No-Action provisions exist to funnel suits through the Trustee, not to somehow affect the decision-making of Harrah's Board. *Peak Partners, LP v. Republic Bank*, 191 Fed.Appx. 118, 126 (3d Cir. 2006) ("The main function of a no-action clause is to 'delegat[e] the right to bring a suit enforcing the rights of bondholders to the trustee.'"). Styling

22

the No-Action provisions as some derivative-like "demand" requirement on the Board is to mistake their purpose and confuse the issue.[24]

### 2. Plaintiffs Lack Standing Under the Trust Indenture Act

Harrah's has amply demonstrated in prior briefing why the TIA does not apply to this case. Simply put, the TIA only applies when (a) a bondholder's right to principal or interest has been impaired (e.g. through changing the terms of the indenture) without their consent, and (b) the issuer has failed to pay interest or principal as originally agreed. (D.I. 13 at 11-12; D.I. 19 at 15-16.) There is no allegation that any Harrah's bondholder (much less either named Plaintiff) has failed to receive promised principal or interest after the due dates for those payments, a prerequisite to application of the TIA. *UPIC & Co. v. Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 455 (S.D.N.Y. 1992); *Brady v. UBS Fin. Servs. Inc.*, 538 F.3d 1319, 1324 (10th Cir. 2008).

Plaintiffs' counsel are wrong to suggest that Harrah's somehow misled this Court by not citing to an out-of-circuit unreported opinion applying the TIA. Indeed, that case, *Federated Strategic Income Fund v. Mechala Group Jamaica Ltd.*, No. 99-10517, 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999), actually supports Harrah's position. In *Mechala*, the issuer (a Jamaica corporation) admitted it could not pay back the full principal on its outstanding bonds, and the exchange offer at issue eliminated certain restrictive covenants and guarantees in outstanding indentures, including provisions for New York service agents, jurisdiction in New York, and maintaining corporate existence. *Id.* at *3. The court found that these changes impaired the

---

[24] Plaintiffs' other excuses for non-compliance are similarly absurd; to the extent the "Unconditional Right of Holders to Receive Principal and Interest" says what Plaintiffs' claim it says, (D.I. 28 at n.6), there has never been an allegation that Harrah's bond holders have not received every last penny of the principal and interest to which they are entitled under their indentures. (D.I. 13 at 12; D.I. 19 at 16.)

bonds by unilaterally changing the existing indentures and effectively impairing "the right to institute suit for the enforcement of payment" as guaranteed by the TIA, since there would no longer be an entity from which to seek payment in the future (and no convenient jurisdiction in which to do it). *Id.* Indeed, plaintiffs' counsel in this case **admit** that the restrictive covenant removal was central to the *Mechala* court's decision. (D.I. 28 at 19.)[25] Here, no such alterations to the terms of the indentures occurred.

### 3. Plaintiffs Facially Lack Standing to Bring Claims On Behalf of Eight of the Ten Classes of Bondholders

Plaintiffs counsel are not entitled to fees on behalf of most bondholders because the parties in this case lacked standing to bring such claims in the first place. Plaintiffs do not hold notes in eight of the ten classes of bonds at issue. (D.I. 13 at 17-19; D.I. 19 at 21-22.) Because they are not a party to those agreements, nor are they third party beneficiaries, they do not have standing to bring claims on behalf of owners of those notes. *Glenn v. Hayman*, No. 07-172, 2007 WL 894213, at *10 n.15 (D.N.J. Mar. 21, 2007) ("Plaintiffs, non-parties to Defendants' contracts, have no standing to sue.") Plaintiffs also lacked standing to sue on behalf of the QIBs who did participate in the First Exchange Offer, as Plaintiffs admitted they did not participate. (D.I. 15 at 48-49.) Contrary to the assertions of plaintiffs' counsel, lack of Article III standing is fatal on a motion to dismiss. *In re RAIT Fin. Trust Sec. Litig.*, No. 2:07-03148, 2008 WL 5378164, at *4 (E.D. Pa. Dec. 22, 2008).

Even if plaintiffs' counsel were correct (they are not) that standing is an issue that need not be addressed until class certification, issues of class certification certainly are applicable to

---

[25] Plaintiffs similarly misapprehend a related issue; they claim that Harrah's has argued that because QIBs tendered shares, their rights to sue have been extinguished. (D.I. 28 at 26.) In fact, Harrah's has argued that because the tendering QIBs expressly consented to their

24

an application for attorneys' fees on behalf of a purported class. Because there is no class (and has never been one), Plaintiffs' counsel are unaware of how many, if any, bondholders (other than named plaintiffs) were "harmed" by the exchange, and therefore has no idea (and will never know) just what benefit accrued to its purported class of plaintiffs. Plaintiffs' counsel should not be awarded fees for parties they do not represent, especially fees paid by Harrah's.

**B.      Plaintiffs' Claims Are Unsupported By Substantive Law**

Harrah's two motions to dismiss extensively discuss why plaintiffs' claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and alleged entitlement to "equitable rescission" are invalid on their face and were dismissible. (D.I. 13 at 20-26; D.I. 19 25-36.) Plaintiffs' counsel's brief in support of their application for attorney's fees does nothing to change those arguments. As such, attorneys' fees for such non-meritorious claims should be denied. *Kahan*, 424 F.2d at 167.

**1.      The Prior Note Indentures Specifically Allow Both Exchange Offers**

In their application for fees, plaintiffs' counsel misunderstand when discussing whether the terms of "the indentures" (as an undifferentiated collective) permit the exchanges. (D.I. 28 at 29-30.) This is because plaintiffs' counsel conflate the ten different classes of notes as if they all had the same contractual provisions, which they do not.

In its motions to dismiss, Harrah's broke up the ten classes into three categories that had similar terms: Senior, Senior Subordinated, and Toggle. Each category allows for the incurrence of additional debt in different ways. (D.I. 13 at 23-27, D.I. 19 at 28-33.) Discussing the permitted indebtedness language of "the indentures" intelligently - without differentiating them - is impossible. Plaintiffs' counsel do not seem to understand that each indenture has

rights being altered, they of course do not have standing to sue on a theory that the

different clauses regarding when additional debt can be incurred, and that Harrah's has explained in detail why both Exchange Offers satisfied each of those provisions. (D.I. 13 at 23-27, D.I. 19 at 28-33.)

For example, plaintiffs' counsel completely misconstrue Harrah's explanation of why the Senior Notes permitted the First Exchange Offer. Plaintiffs' counsel assert that "Defendants conclude, with no explanation, that the "New Debt" is in *pari passu* with 'the notes.' . . . the offering memorandum itself clearly states that 'New Notes' are ***not*** in *pari passu* with 'subordinated indebtedness." (D.I. 28 at 29.) However, what the Senior indentures say is that new debt must retire ***old debt*** that is at least *pari passu* with (i.e. at least equal in seniority with) the Senior notes. (D.I. 19 at 29-30.) This makes sense – if debt is being paid down via the creation of new secured debt, it would seem unfair to a Senior note holder for that secured debt to go towards retiring debt that is farther back in line (in other words, not *pari passu*) than the Senior debt. And, sure enough, that is exactly what the Senior indentures protect against, and the Exchange Offers were plainly structured to accommodate that protection. (D.I. 13 at 24-25, D.I. 19 at 29-30.) [26] The Subordinated Notes, while not *pari passu* with the Senior Notes, are allowed to be retired under a different exemption. (D.I. 19 at 24-6.)

Plaintiffs' counsel further argue (presumably in connection with the Toggle Notes Indenture) that:

---

exchange altered their rights under their indentures.

[26] Plaintiffs' counsel's fundamental misunderstanding of debt offerings is highlighted by their ad hominem attack on Harrah's allegedly "inane" use of the Latin term "*pari passu*." (D.I. 28 at 29.) Harrah's uses the term not because it favors Latin phrases; but because *pari passu* is a term of art used every day in financings all around the world and, more fundamentally, because it is the defined term actually used in the Senior Indenture agreements – indentures the express pre-suit contractual requirements of which plaintiffs' counsel either did not bother to read or simply ignored in their haste to bring the current litigation. (D.I. 13 at 24.)

26

> [t]he definition of 'Funded Debt' ... requires that the debt 'matures
> by its terms on, ... a date more than one year after the date of
> original issuance of such Indebtedness.' [D.I. 19, at pp. 29-30].
> Defendants neglect to contend that the 'New Debt' or 'New Notes'
> comply with this necessary provision regarding maturity, much
> less contend how.

(D.I. 28 at 30.)  However, the Amended Complaint itself alleges that the New Debt carries

maturity dates at least as far into the future as the debt it is replacing, if not farther, none of

which is within one year from the date of issuance.  (D.I. 15 at 32.)

<blockquote>

a.     **The Delaware Chancery Court's Decision In *Realogy* Supports
Harrah's Argument that Indentures Must Be Construed
Narrowly and Enforced According to Their Terms**

</blockquote>

Plaintiffs' counsel attempt to rely on the Delaware Chancery Court's decision in *Realogy*.

However, that decision only underlines Harrah's argument that the terms of the indentures alone

govern this dispute.  While the court in *Realogy* found that the indentures at issue there did not

allow for the issuance of new debt, the real lesson of *Realogy* is that courts must look at what the

indentures say in order to determine the propriety of a debt exchange.  *Bank of N.Y. Mellon v.

Realogy Corp.*, No. 4200, 2008 WL 5259732, at *1 (Del. Ch. Dec. 18, 2008) ("the issue boils

down to whether or not the proposed lien securing the new term loan is [permitted] within the

meaning of the [] indenture. . . [by] [a]pplying New York law of contract interpretation").

Plaintiffs' counsel acknowledge that the court in *Realogy* "interpreted the plain language of the

documents and found that the exchange offers were not Permitted Liens.'" (D.I. 28 at 31.)  Yet,

the same principle applies here, although the outcome is different – unsurprisingly, because the

indentures in this case have different terms than the indentures in *Realogy*.

<blockquote>

2.     **Plaintiffs' Implied Covenant Claims Cannot Depend on the Same
Allegations as Their Contract Claims**

</blockquote>

"[T]o simultaneously plead breach of contract and implied covenant claims under New

York law, a plaintiff must allege an implied duty that is consistent with the express contractual

terms, but base its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims ... a plaintiff adequately states an implied covenant claim by alleging conduct that subverts the contract's purpose without violating its express terms." *JPMorgan*, 2009 WL 321222, at *7 (dismissing two out of three claims for breach of implied covenant on the grounds that they were based on same predicate facts as contract claims and would create obligations that were not part of the written contract).

Here, plaintiffs' counsel have relied on the same predicate facts for each count: Harrah's, via the First Exchange Offer, violated qualifying Prior Bond holders' indentures by exchanging Prior Bonds for New Bonds, thereby excluding non-QIB bondholders and offering inadequate exchange ratios to QIBs. (D.I. 28 at 35.) Plaintiffs' counsel do not explain how the facts underlying the contract and implied covenant claims differ – because they cannot. [27] Further, plaintiffs' counsel fail to explain how their theory of implied covenant liability does not create obligations beyond what is required by indentures, as they are required to do in order to establish a meritorious claim. *JPMorgan*, 2009 WL 321222, at *7. [28]

## IV. THIS COURT SHOULD DENY PLAINTIFFS' COUNSEL'S FEE REQUEST BECAUSE THE REQUEST IS UNREASONABLE

This Court also should deny plaintiffs' fee request because it is unreasonable. *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990) (holding that the party seeking attorneys' fees

---

[27] Plaintiffs' chart notwithstanding, (*id.* at 35), using different words to describe their contract and implied covenant claims does not mean that the claims are not duplicative.

[28] Contrary to the contention of plaintiffs' counsel, (D.I. 28 at 36), Harrah's never argued in its motion to dismiss that the Amended Complaint was unclear on whether equitable rescission was sought. Rather, Harrah's argued that plaintiffs' counsel had failed to plead any facts supporting equitable rescission (D.I. 19 at 36-37.) Further, plaintiffs' counsel's own request for money damages establishes their belief in the adequacy of a remedy at law. *DB Structured Prods., Inc. v. Baltimore Am. Mortgage Corp.*, No. 07-4109, 2009 WL 399746, at *5 (S.D.N.Y. Jan. 23, 2009); *Prudential Ins. Co. v. BMC Indus., Inc.*, 662 F. Supp. 436, 441 (S.D.N.Y. 1987).

28

has the burden to prove that its request is reasonable). Here, all plaintiffs' counsel have done is file two poorly reasoned complaints. They never litigated the case, and they never received a single favorable ruling.

Despite the summary dismissal of this litigation, plaintiffs' counsel claim to have spent a total of 464.2 hours – presumably constructing their defective complaints. (D.I. 30 at ¶ 23.) Yet, if plaintiffs' counsel were to receive the amount they seek, they would receive over $215,000 per hour for drafting the complaints they did. Courts routinely deny such disproportionate fee requests. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 263 (D. Del. 2002) (imposing a loadstar multiplier cap of 3).

In common fund cases, courts can at times apply the percentage-of-fund method in calculating fees. *In re Cendant Corp. Prides Litig.*, 243 F.3d 722, 734 (3d Cir. 2001). However, to do so, a court must consider:(1) the size of the fund created and the number of persons benefited; (2) the presence or absence of substantial objections by class members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiff's counsel; and (7) the awards in similar cases. *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).

The "most important factors [include] … the 'complexity and duration' of the litigation." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301 (3d Cir. 2005). Courts have questioned whether a 5.7% award of fees is appropriate when "the case was relatively simple in terms of proof … the case was settled at a very early stage … there was a minimal amount of motion practice … discovery was nonexistent … and …[plaintiffs] spent a relatively small amount of time on this case compared to the amount of time expended in most other large class actions." *In*

*re Cendant Corp. Prides Litig.*, 243 F.3d at 735-6. If anything, the present litigation was even less burdensome than *Cendant Pride*; in that case, plaintiffs' counsel expended over ten times the number of hours (5600 hours) than plaintiffs' counsel did here. *Id.* at 732.

Even in common fund cases, courts are required to conduct a check of a percentage-of-fund method by using a loadstar multiplier. *Id.* at 742. The Third Circuit has explained that a multiplier of 3 is the appropriate *ceiling* for a fee award. *Id.* Here, plaintiffs' counsel claim to have spent 464.2 hours working on this case, (D.I. 30 at ¶ 23). Even if plaintiffs' counsel merited any fees (which they do not), using the *maximum* loadstar multiplier of 3, counsel should not receive fees of more than $700,623.25. Yet, plaintiffs' counsel requests over $100 million in fees – which would result in a staggering lodestar multiplier of over 400. Even if plaintiffs' counsel were entitled to any fees (which they are not), his Court should summarily deny such a disproportionate and unreasonable request.

## CONCLUSION

For the foregoing reasons, Harrah's respectfully requests that this Court deny any fee award to plaintiffs' counsel.[29]

---

[29] Because Plaintiffs' counsel's motion should be rejected in its entirety, no discovery is needed. *See, e.g.*, *Deputy v. Taylor*, No. 02-183-SLR, 2003 WL 361216, at *4 (D. Del. Feb. 19, 2003).

OF COUNSEL:

LATHAM & WATKINS LLP

James E. Brandt
Joseph J. Frank
Charles J.G. Mazer
885 Third Avenue, Suite 1000
New York, New York 10022
(212) 906-1200 (office)
(212) 751-4864 (facsimile)


Dated: September 30, 2009

*Kelly E. Farnan*

Gregory P. Williams (# 2168)
Thomas Beck (# 2086)
Kelly E. Farnan (# 4395)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700 (main)
(302) 651-7701 (main fax)

Attorneys for Defendants Harrah's
Entertainment, Inc., Harrah's Operating Co., Inc.,
Charles L. Atwood, Jeffrey Benjamin, David
Bonderman, Anthony Civale, Jonathan Coslet,
Kelvin Davis, Jeanne P. Jackson, Gary W.
Loveman, Karl Peterson, Eric Press, Marc
Rowan, Lynn C. Swann, and Christopher J.
Williams

31

# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2009, I caused to be served by electronic mail and hand delivery the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

**VIA ELECTRONIC MAIL AND HAND DELIVERY**
Joseph A. Rosenthal
P. Bradford deLeeuw
Rosenthal, Monhait & Goddess, P.A.
919 North Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899

I hereby certify that on September 30, 2009, the foregoing document was sent to the following non-registered participants in the manner indicated:

**VIA ELECTRONIC MAIL**
Paul J. Geller
Jonathan M. Stein
Stuart A. Davidson
Cullin A. O'Brien
Coughlin Stoia Geller Rudman & Robbins LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432

Samuel H. Rudman
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
farnan@rlf.com