IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| S. BLAKE MURCHISON, and WILLIS SHAW, | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) C.A. No. 09-20-SLR ) |
| HARRAH'S ENTERTAINMENT, INC., HARRAH'S OPERATING COMPANY, INC., CHARLES L. ATWOOD, JEFFREY BENJAMIN, DAVID BONDERMAN, ANTHONY CIVALE, JONATHAN COSLET, KELVIN DAVIS, JEANNE P. JACKSON, GARY W. LOVEMAN, KARL PETERSON, ERIC PRESS, MARC ROWAN, LYNN C. SWANN, and CHRISTOPHER J. WILLIAMS, | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION
FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT
OF EXPENSES AND LIMITED DISCOVERY TO PROPERLY
DETERMINE THE AMOUNT OF THE AWARD**

Plaintiffs S. Blake Murchison ("Murchison") and Willis Shaw ("Shaw") (collectively, "Plaintiffs"), respectfully submit the following reply memorandum in support of their motion for an award of attorneys' fees and reimbursement of expenses, [D.I. 28], (hereinafter the "Motion"), against Defendants.[1] In support thereof, Plaintiffs state:

---

[1] "Defendants" are Harrah's Entertainment, Inc. ("HEI") and Harrah's Operating Company, Inc. ("HOC"), Charles L. Atwood ("Atwood"), Jeffrey Benjamin ("Benjamin"), David Bonderman ("Bonderman"), Anthony Civale ("Civale"), Jonathan Coslet ("Coslet"), Kelvin Davis ("Davis"), Jeanne P. Jackson ("Jackson"), Gary W. Loveman ("Loveman"), Karl Peterson ("Peterson"), Eric Press ("Press"),  Marc Rowan ("Rowan"), Lynn C. Swann ("Swann"), and Christopher J. Williams ("Williams").

## I. INTRODUCTION

To briefly summarize: Plaintiffs' Motion is based on the fact that after Plaintiffs filed their lawsuit regarding Harrah's[2] unlawful debt exchange (the "First Exchange Offer"), Harrah's conducted a subsequent debt exchange (the "Second Exchange Offer") which admittedly mooted Plaintiffs' claims. Harrah's papers expressly acknowledge this, stating:

> Here, Harrah's *Second* Exchange Offer gave plaintiffs *exactly what they originally claimed they were denied*—a chance to exchange their debt for new securities or cash.

[D.I. 19, at p. 25].[3] Plaintiffs' Motion also explains how Plaintiffs' lawsuit was meritorious when filed, and how the lawsuit was the presumptive cause for the benefit to the putative class. Moreover, as the Motion further explains, the law grants this Court the authority to award attorneys' fees and expenses, and to order limited discovery so that the Court can more precisely determine the amount of Plaintiffs' award.

Harrah's response to Plaintiffs' Motion [D.I. 36], is replete with false *ad hominem* attacks, but devoid of substantive merit. Accordingly, Plaintiffs make the following points in further support of the Motion:

**Point #1:   Harrah's Cannot Credibly Maintain that the Recovery Act Caused the Second Exchange Offer**

Harrah's concedes that "because the Retail Tender Offer component of the Second Exchange Offer extinguished any claims plaintiffs may have had under their theory of 'exclusion' (since every single holder of Harrah's debt was eligible to participate in the Second Exchange Offer), the Amended Complaint was rendered moot." [D.I. 36, at p. 14]. Nevertheless, Harrah's contends that

---

[2]   Defendants HEI and HOC shall be collectively referred to as "Harrah's."

[3]   Emphasis is added and citations are omitted unless otherwise noted.

the American Recovery and Reinvestment Act of 2009 ("the Recovery Act") was the impetus for the Second Exchange Offer, not Plaintiffs' lawsuit.  In support, Harrah's cites to a May 14, 2009 Form 10-Q filing with the Securities and Exchange Commission ("SEC"), which is mislabeled as a "10-K."  [D.I. 36, at p. 20, n.20].  Harrah's contends that because the 10-Q contains a reference to the Recovery Act, it means that the Second Exchange Offer was *caused by* the Recovery Act.

However, on its face, the May 14, 2009 10-Q does not indicate that the Second Exchange Offer was caused in any way by the Recovery Act.  In fact, the Recovery Act is mentioned in the 10-Q only as an afterthought disclosure as it pertains to tax consequences:

> *Exchange Offers Subsequent to March 2009*
>
> On April 15, 2009, HOC completed private exchange offers to exchange approximately $3.6 billion aggregate principal amount of new 10.0% Second-Priority Senior Secured Notes due 2018 for approximately $5.4 billion principal amount of its outstanding debt due between 2010 and 2018. The new notes are guaranteed by Harrah's Entertainment and are secured on a second-priority lien basis by substantially all of HOC's and its subsidiaries' assets that secure the senior secured credit facilities. In addition to the exchange offers, a subsidiary of Harrah's Entertainment paid approximately $97 million to purchase for cash certain notes of HOC with an aggregate principal amount of approximately $523 million maturing between 2015 and 2017. The notes purchased pursuant to this tender offer will remain outstanding for HOC but will reduce Harrah's Entertainment's outstanding debt on a consolidated basis. Additionally, HOC paid approximately $4.8 million in cash to purchase notes of approximately $24 million aggregate principal amount from retail holders that were not eligible to participate in the exchange offers.
>
> As a of result of the exchange offers, we will record a pretax gain in the second quarter of 2009 of approximately $4 billion arising from this early extinguishment of debt and will recognize a deferred tax liability of approximately $1.4 billion related to the gain.
>
> As a result of the receipt of the requisite consent of lenders having loans made under the Interim Loan Agreement representing more than 50% of the sum of all loans outstanding under the Interim Loan Agreement, waivers or amendments of certain provisions of the Interim Loan Agreement to permit HOC, from time to time, to buy back loans at prices below par from specific lenders in the form of voluntary prepayments of the loans by HOC on a non-pro rata basis are now operative. Included in the exchanged debt discussed above are approximately $297 million of 10.0% Second-Priority Senior Secured Notes that were exchanged for approximately $442 million principal amount of loans surrendered in the exchange offer for loans

outstanding under the Interim Loan Agreement. As a result of these transactions, all loans outstanding under the Interim Loan Agreement have been retired.

*__Under the American Recovery and Reinvestment Act of 2009 ("the Act"), the Company will receive temporary relief under the Delayed Recognition of Cancellation of Debt Income ("CODI") rules. The Act contains a provision that allows for a five-year deferral of CODI for debt reacquired in 2009, followed by recognition of CODI ratably over the succeeding five years. The provision applies for specified types of repurchases, including the acquisition of a debt instrument for cash and the exchange of one debt instrument for another.__*

[D.I. 37-7, at p. 11].

Indeed, if the Recovery Act were truly the motive behind the Second Exchange Offer, not only would the 10-Q have stated that in very clear terms, Harrah's multiple prior SEC filings and press releases *__concerning the very debt exchange at issue in this case__* would have said so as well. But none of Harrah's thirteen SEC filings from the announcement of the Second Exchange Offer on March 4, 2009 until the 10-Q even mention, let alone rely on, the Recovery Act—and Harrah's does not contend otherwise.

What is more, Harrah's March 4, 2009 press release gives a purported reason for the Second Exchange Offer, which is *__not__* the Recovery Act, but is a reason that is virtually identical to the reason given by Harrah's on November 14, 2008 for the First Exchange Offer—the only difference being with the two words "debt" and "indebtedness":

| March 4, 2009 Press Release,<br>[D.I. 37-9, at p. 2] | November 14, 2008 Press Release[4] |
|---|---|
| The purpose of the Exchange Offers is to reduce the outstanding principal amount of *__debt__* of HOC and to extend the weighted average maturity of HOC's outstanding indebtedness. | The purpose of the Exchange Offers is to reduce the outstanding principal amount of *__indebtedness__* of HOC and to extend the weighted average maturity of HOC's outstanding indebtedness. |

---

[4]   http://media.corporate-ir.net/media_files/IROL/84/84772/launch_press_release.pdf (last visited November 4, 2009).

Thus, Harrah's stated reason on March 4, 2009 for the Second Exchange Offer was the same reason on November 14, 2008 for the First Exchange Offer -- not the Recovery Act, as Defendants now self-servingly claim.[5]

Nor does Harrah's submit any proof of its position *via* the Offering Memorandum for the Second Exchange Offer which, one would presume, contains an indication of the actual purpose and reason for the Second Exchange Offer.  Surely, if the Second Exchange Offer was due to the Recovery Act, the Offering Memorandum would say it in plain terms, and Harrah's would have no problem submitting that document for the Court's review (*in camera* or otherwise) since Harrah's has already provided a copy the Offering Memorandum for the ***First Exchange Offer*** in this litigation.  Nor is it clear why Harrah's would have a problem submitting a sworn declaration that the reason behind the Second Exchange Offer was the Recovery Act.  Yet Harrah's does not provide the Offering Memorandum or any related sworn testimony–-only unsworn assertions from its lawyers.  Thus, not only is Harrah's purported justification from its lawyers that the Recovery Act caused the Second Exchange Offer unbelievable, it is worthless. *See Markowitz Jewelry Co., Inc. v. Chapal/Zenray, Inc.*, 988 F. Supp. 404, 407 (S.D.N.Y. 1997) ("[T]estimonial evidence submitted on motions must be in the form of affidavits or declarations.  Unsworn statements by counsel simply will not do.").

---

[5]    Furthermore, to the extent that Harrah's is now saying that the stated reason in its own March 4, 2009 press release for the Second Exchange Offer was incomplete and omitted the fact that Harrah's was seeking a windfall under Recovery Act, Harrah's admits to omitting material information in connection with the sale of securities, which could trigger liability under the Securities and Exchange Act of 1934.

Therefore, under Delaware law, Harrah's has not even remotely met its burden of "burden of demonstrating that the lawsuit did not in any way cause their action." *Alaska Elec. Pension Fund v. Brown*, 941 A.2d 1011, 1015 (Del. 2007).

> **Point #2:  Harrah's Position About the Merits of Plaintiffs' Claims Adds Nothing New to the Contentions Harrah's Made in its Motion to Dismiss, Except for at Least Two Additional Mistakes of Law and Fact**

Plaintiffs' Motion demonstrates why their claims were meritorious when filed *vis-à-vis* the contentions made by Harrah's in the motion to dismiss. Harrah's response to Plaintiffs' Motion adds nothing new to what Harrah's has already stated in its motion to dismiss, except for at least two additional mistakes of law and fact.

First, although Harrah's ***finally*** acknowledges the existence of *Federated Strategic Income Fund v. Mechala Group Jamaica Ltd.*, No. 99 CIV 10517 HB, 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999), Harrah's contends that it does not apply because the "central" issue in that case was "restrictive covenant removal." [D.I. 36, at p. 24]. That is incorrect. As explained in Plaintiffs' Motion, *Mechala* makes clear that Harrah's act of subordinating the bonds for holders that were excluded from the First Exchange Offer, in and of itself, triggers liability under the Trust Indenture Act, 15 U.S.C. §§77aaa, *et seq*.

Second, although Harrah's also belatedly acknowledges the existence of *Bank of N.Y. Mellon v. Realogy Corp.*, C.A. No. 4200-VCL, 2008 WL 5259732, at *1 (Del. Ch. Dec. 18, 2008), Harrah's contends that it does not apply because "the indentures in this case have different terms than the indentures in *Realogy*." [D.I. 36, at p. 27]. That contention is as erroneous as it is irrelevant. As is also explained in Plaintiffs' Motion, because the court in *Realogy* found than an exchange offer, like the one here, ***breached a contract*** due to the ***prioritization effect*** it would have on certain bonds, *Realogy* makes crystal clear that Harrah's contention that the bonds at issue here ***explicitly allowed***

for the subordination in the First Exchange Offer rings hollow. Defendants' argument that the New Notes would properly be considered "Senior Debt" is circular and not supported by any evidence. [D.I. 36, at p. 26]. In addition, Defendants' purported justification of the New Notes under the "Limitations on Liens" section is totally deficient because: 1) Defendants provide no clarity regarding which definition in the voluminous "definition" section they are supposedly relying on, 2) Defendants fail to explain the invented "difference" between "New Debt" and "New Notes," 3) Defendants fail to explain with which notes the "New Debt" is in *pari passu*, 4) Defendants fail to explain how it is at all possible for the "New Debt" to be in *pari passu* (*i.e.*, "in equal step") with retired debt or subordinated debt, 5) Defendants do not even claim that the "New Debt" meets the maturity requirement for "Funded Debt, and 6) Defendants did not argue that compliance with the 15% rule was met at all times.

Thus, Harrah's attempt to distinguish *Realogy* fails, and Harrah's has still not provided any explanations or support for its impossible interpretation of the indentures identified above and in Plaintiffs' Motion. Harrah's inability to explain its unfeasible interpretation of the indentures serves as a tacit admission that Harrah's is unable to provide any answers and that its interpretation is, indeed, meritless.

      **Point #3:**      **Plaintiffs Are Entitled to an Award of Attorney's Fees**

Harrah's contends that Plaintiffs are not entitled to an award of attorney's fees because neither the corporate benefit doctrine nor the common fund doctrine applies. Harrah's is wrong.

As for the corporate benefit doctrine, Harrah's contends that because Plaintiffs and the putative class were not shareholders, the corporate benefit doctrine cannot govern the tangible benefits bestowed upon them *vis-à-vis* the Second Exchange Offer because, circularly, the corporate

7

benefit doctrine only applies to shareholders and not to bondholders. Harrah's, however, cites no legal authority for that proposition, nor is undersigned counsel aware of any.

As for the common fund doctrine, Harrah's contends that there is no common fund from which an award of attorney's fees could be paid. On this point, the principles set forth in *Brewer v. School Bd*, 456 F.2d 943, 951 (4th Cir 1972), are dispositive. In that school desegregation case, the Court found a common fund based on equitable principles where the lawsuit achieved an "effect" that was "the same as though a fund were created." Specifically, the court found, after citing to *Kahan v. Rosenstiel*, 424 F.2d 161 (3d Cir. 1970) – a case which Plaintiffs cited in the Motion, [D.I. 28, at p. 2] – as follows

> The students have secured a right worth approximately $60 per year to each of them. This pecuniary benefit to the students involved would, under normal circumstances, warrant the imposition of a charge against them for their proportionate share of a reasonable attorney's fee incurred in securing such pecuniary benefit for them. It is not practical, however, to do this in this case and, too, to do so would defeat the basic purpose of the relief provided by the amendment in the decree, which was to secure for the student concerned transportation without cost or deduction. The only feasible solution in this peculiar situation would seem to lie in requiring the school district itself to supplement its provision of free transportation with payment of an appropriate attorney's fee to plaintiffs' attorneys for securing the addition of such a provision to the plan of desegregation. There are thus "dominating reasons" under the "exceptional circumstances" of this case to award attorney's fees for the services of plaintiffs' attorneys in securing for these students this pecuniary benefit.

*Brewer*, 456 F.2d at 951-952.

That same analysis applies here. The Second Exchange Offer is, like the relief achieved in *Brewer*, the functional equivalent of a common fund. Moreover, without Plaintiffs' lawsuit, Plaintiffs and the putative class would not have received that substantial, tangible benefit. And because Harrah's has not met its burden to rebut this presumptive cause, there are the same types of "dominating reasons" and "exceptional circumstances" upon which to issue an award of attorney's fees as was found in *Brewer*.

To be sure, Plaintiffs have zealously represented the interests of the putative class pursuant to bedrock law, which was set-forth in Plaintiffs Motion but is worth re-stating here:

> Enactment of Section 316(b) [of the Trust Indenture Act] is attributable to the Securities Exchange Commission's concern about the motivation of insiders and quasi-insiders to destroy a bond issue through insider control, and the generally poor information about a prospective reorganization available to dispersed individual bondholders. In 1939, the Commission addressed this concern by seeking to have recapitalizations placed under regulatory and judicial control. The Commission accordingly recommended to Congress legislation, in the form of Section 316(b), that would bring contractual recapitalizations under Bankruptcy Court jurisdiction.
>
> Section 316(b) tends to force recapitalizations into bankruptcy court by frustrating a distressed firm's efforts to successfully complete a consensual workout. When a distressed or nearly bankrupt firm seeks to reorganize its financial structure, the incentives among those financially interested in the firm would generally be to contract to the efficient solution and avoid the transaction costs of a bankruptcy proceeding. In a workout affecting bondholders, however, Section 316(b) tends to frustrate such a consensual workout. By guaranteeing a bondholder's right to receive payment of the principal of or interest on the security, Section 316(b) creates a disincentive for bondholders to exchange their bonds for stock or for bonds with different terms. Bondholders aware of the perceived advantage of refusing to participate in the workout-payment in full after, and if, the recapitalization succeeds-will do so, seeking to benefit from the workout at the expense of those who would renegotiate their credits or offer new capital. The holdouts thus seek to be "buoyed-up" by the workout's participants.
>
> The "buoying-up" effect places the distressed firm under further stress. In order to overcome the effect, nearly equal treatment of bondholders is necessary since equal treatment reduces the incentive for bondholders to hold out. A reduced incentive to hold out enhances the firm's ability to achieve near unanimous agreement on the terms of any contemplated recapitalization and thereby increases the chances of a successful consensual workout. ***Without equal treatment of creditors, the near consensual unanimity necessary for a successful workout is frustrated by holdouts and the buoying-up effect, and the workout fails. The Securities Exchange Commission was undoubtedly aware that requiring unanimity in bondholder voting-rather than mere majority action-would frustrate consensual workouts and help induce bankruptcy. And convinced that insiders or quasi-insiders would damage bondholders, the Commission welcomed the prospect.***

*UPIC & Co. v. Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 452-53 (S.D.N.Y. 1992).

In response, Harrah's attempts to trivialize this lawsuit, first by taking a swipe at a former attorney, S. Gene Cauley, [D.I. 36, at pp. 4, 8], and then by casting a wide net over an entire school

9

of red herrings. For example, Harrah's spends its time discussing and blatantly misrepresenting other cases pursued by Plaintiffs' counsel, Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia"). Harrah's contends that Coughlin Stoia was "forced to dismiss a virtually identical case against Station Casino (*sic*) and its debt exchange offer." But that is patently false. As the public record reveals, the plaintiff in *Station Casinos* took a voluntary dismissal of the case against the Company. Further, Station Casinos subsequently filed for bankruptcy protection, which would have prohibited the lawsuit against the company. Similarly, Harrah's mischaracterizes the proceedings in an unrelated action against GMAC by implying in the introductory portion of Harrah's response that the action is somehow "short lived" and not longer proceeding, [D.I. 36, at p. 4 ], only to half-heartedly clarify that misrepresentation in a convoluted and disjointed footnote pages later, [D.I. 36, at p. n. 12]. Not only is that case irrelevant to the merits of plaintiffs' claims in this case, but, in reality, the case against GMAC is currently proceeding, and defendants' motions to dismiss fully briefed.

Additionally, Harrah's interpolation of the news clippings of exchange offers conducted by Ford, NXP, and iStar, without any explanation or analysis, is just as immaterial. Harrah's uses these news clippings to posit the astonishing proposition that, because other three other companies conducted exchange offers after the Recovery Act went into effect, it not only means that those companies conducted the respective exchange offers ***because of*** the Recovery Act, but its also means that Harrah's Second Exchange Offer was caused by the Recovery Act. It is beyond cavil for Harrah's to attempt to speak for the motives of Ford, NXP, and iStar, and is equally incredible for Harrah's to ask this Court to understand Harrah's motives behind the Second Exchange Offer with the reference to what Harrah's thinks the motives of Ford, NXP, and iStar were.

Similarly, Harrah's also throws Section 144A at the wall as a purported justification for the unlawful conduct at issue here. However, Harrah's cites no authority for the proposition that Section 144A permitted Harrah's to violate the rights of minority bondholders, nor is undersigned counsel aware of any. Likewise, Harrah's fallaciously accuses "Coughlin Stoia of attempting 'to avoid Delaware Chancery Court by alleging violations of the federal Trust Indenture Act.'" The list goes on.

Nevertheless, at the end of the day and despite Harrah's distracting and unsavory tone, Plaintiffs' Motion presents several basic questions to this Court, and Harrah's response demonstrates why the answers are unanimously, "Yes." Did the Second Exchange Offer provide a substantial tangible benefit to Plaintiffs and the putative class? Yes. Was Plaintiffs' lawsuit the presumptive cause of the Second Exchange Offer? Yes. Have Defendants failed to rebut that presumption? Yes. Are Plaintiffs entitled to an award of attorney's fees and costs? Yes. Is discovery appropriate to determine the amount? Yes.

**Point #4:    Plaintiffs Do Not Seek an Excessive Fee Award**

Defendants contend that Plaintiffs seek an unreasonable fee request. That is not true. As Plaintiffs explained in detail in the Motion, Plaintiffs ask this Court to award Plaintiffs attorneys' fees and expenses in the amount equal to 25% of the $2.77 million in benefit received by retail holders in the Second Exchange Offer, 25% of the portion attributable to bonds held by accredited investors involved in the $66 million dollar benefit rendered in the HBC cash tender component of the Second Exchange Offer, and 25% of the portion attributable to bonds held by accredited investors involved in the $347 million dollar benefit achieved via the note exchange component of the Second Exchange Offer, after the portion received by accredited investors is determined pursuant to the limited discovery Plaintiffs request. Harrah's assumes *arguendo* that $700,623.25 would be

11

an appropriate and reasonable amount of an award.  Plaintiffs agree that that is essentially the amount Plaintiffs seek as a portion of the benefit attributable to the *retail holders*.  However, Plaintiffs respectfully submit that there is no rational reason to only credit Plaintiffs with the cash component of the benefit conferred upon retail holders in the Second Exchange Offer when it Plaintiffs' efforts also obtained significant benefits for accredited investors in the Second Exchange Offer that can be ascertained with limited discovery.

WHEREFORE, for the reasons stated herein and in Plaintiffs' Motion, Plaintiffs respectfully ask this Court to grant Plaintiffs' Motion.

November 13, 2009                                    ROSENTHAL, MONHAIT & GODDESS, P.A.


*s/ P. Bradford deLeeuw*
Joseph A. Rosenthal (Delaware Bar No. 234)
P. Bradford deLeeuw (Delaware Bar No. 3569)
919 N. Market Street, Suite 1401
P. O. Box 1070
Wilmington, DE  19899
(302) 656-4433
jrosenthal@rmgglaw.com
bdeleeuw@rmgglaw.com

*Delaware Counsel for the Plaintiffs*

OF COUNSEL:

COUGHLIN STOIA GELLER RUDMAN
   & ROBBINS LLP
PAUL J. GELLER
JONATHAN M. STEIN
STUART A. DAVIDSON
CULLIN A. O'BRIEN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
(561) 750-3000

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100

RICH WALDEN
WALDEN LAW FIRM, PLLC
8201 Cantrell, Suite 315
Little Rock, AR 72227
(501) 907-7000